**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Darryl Nichols PAYNE, Defendant–
Appellant.**

No. 92–1437.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1993.

Decided Aug. 27, 1993.

See also 55 M.S.P.R. 317.

James C. Mitchell, Jennifer Mulhern Granholm, Kathleen Moro Nesi, Asst. U.S. Attys. (argued and briefed), Detroit, MI, for plaintiff-appellee.

Douglas R. Mullkoff (argued and briefed), Ann Arbor, MI, for defendant-appellant.

Before: JONES and SUHRHEINRICH, Circuit Judges; and WELLFORD, Senior Circuit Judge.

PER CURIAM.

Defendant–Appellant Darryl Nichols Payne appeals his conviction for obstruction and desertion of mail. For the foregoing reasons, we affirm the decision of the district court with respect to several of the issues raised by Payne; however, we reverse Payne's conviction and remand for further proceedings.

## I.

### A.

On September 25, 1991, a grand jury charged Payne in a seven-count indictment with four counts of soliciting bribes and attempting to solicit bribes, in violation of 18 U.S.C. §§ 201(b)(2)(A) (1988) and 201(b)(2)(C) (1988); two counts of obstructing mail, in contravention of 18 U.S.C. § 1701 (1988); and one count of deserting mail, in violation of 18 U.S.C. § 1700 (1988).

On December 20, 1991, a jury found Payne guilty on the obstruction and desertion counts and not guilty on the other counts.

On April 2, 1992, the district court sentenced Payne to three months home confinement and two years probation.

### B.

Payne was a postal carrier for the U.S. Postal Service in Jackson, Michigan. The charges in the indictment arose from several complaints which the Postal Service received from postal patrons along Payne's regular delivery route. As a result of numerous complaints about problems with delivery of Social Services checks, the Postal Service began an investigation of Payne. The fruits of that investigation provided the following evidence at Payne's trial (as it relates to the counts the jury found Payne guilty of):

On October 27, 1990, Karen Mass did not receive her Aid to Dependent Children (ADC) check in the mail as she expected. Later, Payne told her that he did not deliver her check because of a vicious dog being present in the neighborhood.

On December 1, 1990, Charlotte Cole was waiting for delivery of her ADC check with her neighbor, Patricia Peterson. According to Cole, Payne had previously warned her that he would not deliver mail if her dog was running loose. As a result of that warning, Cole testified that she had her dog locked up on December 1, 1990. Nonetheless, Payne did not deliver Cole's mail because of the

presence of a "vicious dog" on the premises. Michael Willis, a postal inspector, determined at a later date that Cole's dog was nonaggressive. In addition, Payne's supervisor, William Gibbs, also encountered no dog problems when he investigated complaints against Payne.

Deborah Miller also had problems with Payne delaying the delivery of her ADC check. He had previously told her that he would not deliver her check unless she kept her name on the mailbox, repaired a step, and kept her steps swept clean of snow. According to Miller, on February 6, 1991, her name was written on paper and taped to the mailbox with duct tape. Payne did not deliver the mail until the next day because, he alleged, her name was not on the mailbox the previous day.

On some occasions, Payne gave mail to Barry Kirkum, a neighborhood resident who was not employed with the post office. Payne would expect Kirkum to complete the mail delivery in the neighborhood for him. Other times, Payne would leave mail at one person's house and expect that person to deliver it to his/her neighbor. Payne admitted that he handed mail to people to deliver to their neighbors, but he claimed that he received approval from his supervisors to do so and that he did it on only two occasions.

## II.

■ Payne first argues that a prior administrative decision by an Administrative Law Judge (ALJ) should have collaterally estopped the government from bringing this particular prosecution. Before Payne was indicted federally, the U.S. Post Office removed Payne from his employment because of allegations substantially similar to those in the indictment. Payne appealed the removal to the Merit Systems Protection Board (Board), an administrative law tribunal. After a hearing before an ALJ and prior to its decision, Payne was indicted federally on substantially similar claims of wrongdoing. Subsequent to the indictment being filed, the ALJ concluded that the removal action was improper because the U.S. Postal Service had failed to prove its allegations by a preponderance of the evidence. The Postal Ser-

vice did not appeal the ALJ's decision, therefore, that decision became the final decision of the Board. J.A. at 53.

■ Collateral estoppel prevents an issue of ultimate fact that has been determined by a valid and final judgment from being relitigated between the same parties in any future lawsuit. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). "The doctrine of collateral estoppel is a judicially developed mechanism to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" *United States v. Alexander,* 743 F.2d 472, 475 (7th Cir.1984) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)). Collateral estoppel is not proper unless the party against whom the earlier decision is asserted had "a full and fair opportunity" to litigate the issues. *Allen,* 449 U.S. at 95, 101 S.Ct. at 415.

In *Yates v. United States,* 354 U.S. 298, 335, 77 S.Ct. 1064, 1085, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks v. United States,* 437 U.S. 1, 2, 98 S.Ct. 2141, 2142, 57 L.Ed.2d 1 (1978), the Supreme Court noted that the doctrine of collateral estoppel is not made inapplicable by the fact that the second proceeding is a criminal case and the prior proceeding was civil in nature. Furthermore, the courts have increasingly given collateral estoppel effect to the determinations of administrative agencies acting in a judicial capacity where the second proceeding is civil in nature. *See, e.g., Bowen v. United States,* 570 F.2d 1311, 1321–23 (7th Cir.1978).

Notwithstanding the above, the Seventh Circuit has stated, "In no case has a federal court presiding over a criminal trial granted preclusive effect to a prior administrative ruling contrary to the Government's position in the criminal case." *Alexander,* 743 F.2d at 476. *See also United States v. Lasky,* 600 F.2d 765, 768 (9th Cir.) ("We have found no case in which a defendant in a criminal proceeding sought to use a prior favorable administrative decision to preclude trial of the matters contained in the indictment."), *cert.*

*denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).[1]

In *Alexander,* an ALJ denied an injunction request by the U.S. Postal Service against the defendant's company. The ALJ found that the Postal Service had failed to prove that the company had been involved in a scheme to defraud. Between the time the Postal Service filed its complaint and the decision of the ALJ was rendered, the government indicted the defendant on criminal charges based upon most of the same transactions through which the Postal Service had sought to establish its right to an injunction. The defendant claimed that the ALJ's decision collaterally estopped the government from bringing charges against him. The Seventh Circuit held that although there was mutuality of parties, the court would not grant the ALJ decision estoppel effect. In support of its holding, the court stated, "To allow such preclusion would present a debilitating impediment to the enforcement of the federal criminal law." *Id.* at 476. The court also noted:

Furthermore, collateral estoppel in this context would affect seriously the executive branch decisions to enforce regulatory schemes. If an administrative decision against the Government precluded subsequent prosecutions, the Government might hesitate to bring enforcement proceedings at all. The clear intent of Congress in the establishment of these regulatory schemes was to provide an informal and expeditious adjudicatory setting for the determination of regulatory violations, subject, of course, to various mechanisms of review. If we were to endow initial administrative decisions with preclusive effects on criminal actions, the Government would either have to postpone the administrative action until it obtained a favorable result in the corresponding criminal case or have to allocate substantially greater resources to the en-

forcement of regulations to increase the likelihood of a favorable outcome at the administrative level. We refuse to impose such a burden upon the Government's decision as to the allocation of its limited resources.

*Id.* at 477. Although the Seventh Circuit was dealing with an initial determination, the court stated, in dictum, that it would have reached the same result even if the indictment followed a final administrative determination. The court stated, "Even had the Judicial Officer affirmed the administrative law judge's decision in the present case, we would not grant the final administrative decision estoppel effects because of the strong policy in favor of the enforcement of the criminal law." *Id.*

In *People v. Sims,* 32 Cal.3d 468, 186 Cal. Rptr. 77, 92–93, 651 P.2d 321, 336–37 (1982) (Kaus, J., dissenting), Justice Kaus reasoned similar to the Seventh Circuit by stating:

[I]t becomes evident that there are many administrative bodies which in the course of their ordinary duties frequently pass on factual disputes concerning conduct that may also be the subject of a criminal prosecution. Professional licensing boards, prison disciplinary panels, local school boards, the State Personnel Board, labor relations boards and the like may all have occasion to determine—for their own specialized purposes—whether or not an individual committed alleged misconduct. In granting an administrative body the authority to make this factual determination within a particular administrative context, the Legislature surely did not contemplate that the administrative decision would be routinely conclusive on the ultimate issue of an individual's guilt *or innocence* of criminal charges relating to the same factual incident. . . .

---

1. One state court has held that an administrative hearing can collaterally estop a criminal prosecution. *See People v. Sims,* 32 Cal.3d 468, 186 Cal.Rptr. 77, 87–90, 651 P.2d 321, 331–34 (1982) (court held that where county's request for restitution of Aid to Families with Dependent Children benefits resulted in a fair hearing determination by the Department of Social Services that no fraud had been committed, that administra-

tive decision collaterally estopped a criminal prosecution for the same charge, since the welfare fraud issue was properly raised and actually litigated at the administrative hearing, the administrative hearing resulted in a final judgment on the merits, and the county, which was party to the administrative proceeding, and the district attorney, who represented the party to be estopped, were in privity with each other).

... The statutory scheme reveals that the fair hearing mechanism is intended to provide an aggrieved welfare recipient with a speedy and informal means to challenge an administrative action which may reduce or terminate vitally needed social service benefits. Judicial authorities have frequently observed that, as applied to this kind of administrative proceeding, "[c]ollateral estoppel is by no means an unmixed blessing"; if the decision at the fair hearing is given important—indeed, potentially determinative—consequences for an upcoming criminal prosecution, the entire atmosphere and manner of conduct of the fair hearing will be significantly changed, and the administrative hearing will be transformed, in effect, into the first stage of the criminal prosecution itself. To insure that the People's opportunity to prove the criminal charges is not lost, the county will be required to marshall all of the prosecution's potential witnesses and evidence at the administrative level; prehearing delays and lengthy hearings will be the predictable result. Furthermore, the majority's conclusion will have the unfortunate effect of requiring district attorney offices to allocate a greater proportion of their ever-decreasing resources to administrative matters, rather than reserving these scare [sic] resources for the actual prosecution of serious criminal cases in court.

(Emphasis in original.) (Citations omitted.)

We find the reasoning of the Seventh Circuit and the dissent in *Sims* persuasive. *Cf.* *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (the Court held that collateral estoppel is not applicable in a criminal prosecution of one defendant when a co-defendant was previously acquitted of substantially similar and related charges). We adopt the reasoning of the Seventh Circuit and the dissent in *Sims* and hold that the enforcement of the Postal Service's regulations should not constrain the enforcement of the federal criminal law. As a result, we hold that this administrative hearing did not collaterally estop the government from this criminal prosecution against Payne.[2]

### III.

In addition to arguing that the favorable ruling on the administrative level prevents this prosecution on collateral estoppel grounds, Payne also argues that the government is collaterally estopped on double jeopardy grounds from prosecuting this case. Specifically, Payne contends that the Double Jeopardy Clause of the Fifth Amendment prevents this prosecution since the postal service had already punished him by removing him from their employment.

In *United States v. Reed*, 937 F.2d 575 (11th Cir.1991), the Eleventh Circuit rejected a similar challenge on facts which closely parallel those in this case. In *Reed*, the Postal Service had discharged the defendant, a letter carrier, for misappropriating funds. Defendant successfully grieved his dismissal and an arbitrator ordered his reinstatement. Subsequently, a grand jury charged the defendant with misappropriating postal funds in violation of 18 U.S.C. § 1711 (1988). The defendant moved for dismissal based on double jeopardy. The Eleventh Circuit rejected this argument, holding that since the penalty imposed, suspension from employment, served "legitimate nonpunitive governmental objectives" under the employment contract, it did not amount to punishment for double jeopardy purposes. *Reed*, 937 F.2d at 577–78. The court cautioned that the application of double jeopardy in a civil context would "work an absurd result" and refused to "offer up the Double Jeopardy Clause as a forum-shopping tool for government employees who have violated the law." *Id.* at 578.

Similarly, in the present case, Payne appealed his dismissal from the Postal Service, which was premised upon the same bad acts charged in the indictment, to the Board. As the Postal Service dismissed Payne for the

---

**2.** The prosecution did note that it had no control over the litigation before the ALJ and that it could not interfere with the decision of the Postal Service not to appeal the ALJ's decision. For the purposes of this opinion, we assume that the Postal Service and the United States government are in privity with each other, such that there is mutuality of parties. *See Alexander*, 743 F.2d at 476 (there is mutuality of parties between the Postal Service and United States government).

legitimate purpose of enforcing its employment contract, the administrative hearing on this dismissal did not amount to a determination of punishment for double jeopardy purposes. As a result, we reject Payne's contention for the reasons stated in *Reed.*

## IV.

■ Payne next argues that the prosecutor engaged in prejudicial misconduct. Specifically, Payne states that the prosecutor's references to the plight of poor children, to Christmastime, and to the then-recent announcement by General Motors ("GM") of a 75,000–person layoff in his closing and rebut-

tal arguments intentionally placed before the jury facts not in evidence that were inflammatory and prejudicial.[3] The government argues that the comments were invited by defense counsel's presentation of its case. For example, the government points to defense counsel's opening statement and how it focused on the "seediness" of the people who accused Payne and their low economic status.[4]

■ When reviewing alleged prosecutorial misconduct, this court considers

the degree to which the remarks complained of have a tendency to mislead the

---

3. Payne points to the following closing argument by the government as being prosecutorial misconduct:

MR. HOLMAN [Prosecutor]: ... I know that this is the week before Christmas. Everybody has other things they would rather do.

But your jobs here are important ones and we had to take this time because this is an important [task] that you're being asked to perform....

What is this case about, ladies and gentlemen? It is about [greed] and it's about victimization, it's about taking advantage of the poor and some of the most neediest people in our state.

. . . .

These are people who the evidence shows were taken advantage of and made to suffer by the defendant. And each one of these people, ladies and gentlemen of the jury, had one thing in common, they were all poor people.

And I can hardly think of anything lower [than] taking advantage of a poor person, except maybe taking advantage of a child or taking advantage of someone who's retarded or maybe [taking] advantage of someone who's elderly.

But what the defendant did here, in effect, he was taking advantage of children. He was taking advantage of a mother's ability to provide for their [necessities] in the only ways they had, which was through their social services checks.

. . . .

Again, be wary of smoke screens. Keep your eye on the ball. It's not what the victims did, it's what this defendant did that counts.

We all know it's Christmas time now and most people think of the people at Christmas time.

MR. MULLKOFF [Defense counsel]: I object to this.

THE COURT: Sustained.

MR. HOLMAN: Some people might question why we would bring this case. Maybe they think it's unimportant for poor people to get their mail, maybe they think that poor people are unimportant. Maybe they have a problem

with anybody who's on ADC or general assistance.

But, ladies and gentlemen, I ask you to stop and think about yesterday's headlines we read that 75,000 people will be laid off at GM.

MR. MULLKOFF: Sustained [sic].

THE COURT: Mr. Holman, get to the evidence and arguments on the evidence.

J.A. at 159, 162–63.

4. Defense counsel's (Mr. Mullkoff's) opening statement included the following:

In order to understand this case, I agree with Mr. Holman that you're going to have to try and put yourself into this neighborhood and understand what it's like. And you're going to have to descend into the depths of this somewhat seedy neighborhood. I think you're going to hear testimony that this is a highly transient neighborhood where people move from house to house or apartment to apartment, don't stay long.

There are great numbers of people in each dwelling. The individuals who stay in these houses or don't stay there come and go. It's a lower-economic area. This is an area that's a denizen of drunks, drug addicts, where the postman, on a daily basis encounters hustlers and con men where going to work in the morning is the exception and not the rule.

You're going to hear testimony about men who scheme to get Government assistance, spend the days drinking, lining up at the liquor store when it opens up, panhandle. You're going to hear testimony about people who use residences as drop spots for Government checks. Checks without ever having an intent of setting a foot inside.

. . . .

... You're going to hear what they came up with through testimony presented by the Prosecution in the form of disgruntled A.D.C. and welfare recipients who had a beef with their postman every time their welfare check didn't arrive the day they expected it or wanted it.

Trial Tr. of 12/17/91, Vol. II at 27–28, 31.

jury and to prejudice the accused; whether they were isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proofs introduced to establish the guilt of the accused.

*United States v. Leon,* 534 F.2d 667, 679 (6th Cir.1976); *see Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982); *see also United States v. Bess,* 593 F.2d 749, 757 (6th Cir. 1979).

■■■ If the court finds prosecutorial misconduct, the court must then consider whether, on the entire record, the misconduct can be said to be harmless. *United States v. Krebs,* 788 F.2d 1166, 1177 (6th Cir.) (citing *Leon,* 534 F.2d at 682), *cert. denied,* 479 U.S. 930, 107 S.Ct. 400, 93 L.Ed.2d 353 (1986). To deny a defendant a fair trial, prosecutorial misconduct must be " 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.' " *United States v. Vance,* 871 F.2d 572, 577 (6th Cir.) (quoting *United States v. Mahar,* 801 F.2d 1477, 1503 (6th Cir.1986)), *cert. denied,* 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989). As stated by the Supreme Court in *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985), "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *Id.* at 11–12, 105 S.Ct. at 1044. "[T]he Court must consider the probable effect the prosecutor's response [to defense counsel's conduct and comments] would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *Id.* at 12, 105 S.Ct. at 1044. This has been called by courts the "invited response" or "invited reply" rule. *Id.* at 11, 105 S.Ct. at 1044 (citation omitted).

■■■ Furthermore, "[n]ot every instance of misconduct requires the reversal of a con-

viction ... and when isolated remarks are made in the course of a long trial and the jury is given an appropriate cautionary instruction designed to overcome or to dissipate any prejudice that may have been caused, the error may be harmless." *Leon,* 534 F.2d at 679.

Turning to this case, we find that the comments had the ability to mislead the jury as well as ignite strong sympathetic passions for the victims and against Payne. Occurrences like Christmas and major employee layoffs, because they affect or potentially affect such a broad scale of people, are going to invoke emotions which may cloud the jury's determination of Payne's guilt. *Cf. United States v. North,* 910 F.2d 843, 895 (D.C.Cir.) (court held that argument by special prosecutor in which he linked the defendant's strategy favorably to Adolf Hitler's strategy was "[u]nquestionably inflammatory"), *opinion withdrawn and superseded in part on reh'g,* 920 F.2d 940 (D.C.Cir.1990) (per curiam order), *cert. denied,* — U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *United States v. Stahl,* 616 F.2d 30, 31–33 (2d Cir.1980) (in case where government continually equated wealth with wrongdoing and appealed to the potential bias of not-so-wealthy jurors against a very wealthy defendant, the court found that there was prejudicial prosecutorial misconduct). In particular, the comment about GM probably would have tremendous emotional impact on a jury sitting in Michigan because GM employs so many Michigan residents. Furthermore, even though no children were called as witnesses or listed as victims, the prosecutor claimed that Payne took advantage of children. We find this statement somewhat misleading because there was no direct evidence that Payne actually affected the welfare of any particular children.

The remarks are not isolated to the closing and rebuttal arguments of the prosecution. From the government's opening statement right up to its closing arguments, the government used other opportunities to characterize Payne as a bad individual who would take advantage of poor, pregnant women, and helpless children. For example, in the gov-

ernment's opening statement, the prosecutor stated:

> I'm sure everybody here has heard of Jackson, Michigan. But what you may not have heard of is that Jackson is a heavily depressed community in our state. It's a town that has been hard hit by layoffs and the recession that we're all enduring right now. There are many plants in the City of Jackson that have closed down in the last ten, twenty years throwing thousands of people out of work.
>
> In addition to that, one of the largest employers in Jackson is the State of Michigan, which everybody knows has a prison there. Well, even the State of Michigan has been hard hit by the recession, and people have been thrown out of work that work for the State of Michigan. All of this has had the effect of increasing suffering among people there and forcing people on to the welfare rolls.
>
> Picture, if you will, also, a couple of blocks in the City of Jackson, blocks located near the downtown area, places that once were very nice places to live, but since the recession and the hard times that have evolved up on the city have become somewhat delapidated [sic]. Houses that are crumbling, there are vacant lots that are there, all sorts of suffering. And picture, if you will, men and woman who try to raise a family in this area. Men and [sic] come like many of us who are dependent on their paychecks and who live check to check, paycheck to paycheck. People who suffer when they don't receive their checks on time in the mail. People who, as a result, can't buy diapers for babies.

Trial Tr. of 12/17/91, Vol. II at 24–25. The court sustained an objection after the prosecutor's reference to buying diapers for babies.

In addition to the comments made during the opening statement, the prosecutor raised the issue about babies and nine-month pregnant women during cross-examination of a defense witness. The defense called Ernest Hobart, the Jackson, Michigan, Letter Carriers' Union President, as one of its witnesses. Hobart testified concerning Payne's problems with being only one of three black postal employees out of a workforce of 100. He testified about Postal Service policies regarding forwarding letters, loose dogs, and delivery of welfare checks. Hobart described the tense relationship between management and Payne and derogatory remarks made by a supervisor concerning Payne. Hobart also testified that there were policies which pertained to letter carriers, but in Payne's case, supervisors would ask him "to do things above and beyond what we would do as a normal, as a regular carrier." J.A. at 106. Hobart's testimony implied that Payne was subjected to different rules and policies. Among the different policies Hobart stated that Payne was subjected to were: 1) Payne was told to handle undelivered mail from the Department of Social Services differently, 2) he was told to deliver mail to unauthorized locations, and 3) he would not get help on days when there was more than the usual amount of mail to be delivered.

On cross-examination, the prosecutor attempted to show that the reason Payne was subjected to different rules and policies was because Payne had numerous complaints lodged against him by postal patrons. In essence, the prosecutor was trying to test Hobart's knowledge about why Payne was treated differently. In testing that knowledge, the government asked about one postal patron's complaint about Payne. Defense counsel objected to the question on grounds of hearsay, relevance, and being less probative than prejudicial. The court overruled the objection because it concluded that the defense had opened the door by allowing Hobart to testify that he thought Payne was subject to different policies. The government then proceeded to question Hobart about several complaints the Postal Service received about Payne. Hobart only vaguely remembered reading about a couple of the complaints. After the government questioned Hobart about several complaints, the prosecutor asked Hobart:

> Do you recall a complaint that was made last December by a customer who complained that the Defendant was belligerent and neglective in his attitude and that she had to wait a long time to be able to get her mail and then the Defen-

dant wouldn't give it to her, instead walked down the road where he could keep away from her? And that when she followed behind him to ask for her check so that she could buy diapers and medicine he got in her face and threatened her with physical violence.

Trial Tr. of 12/19/91, Vol. III at 265. After that question, the court decided to give a limiting instruction:

Ladies and gentlemen, all of these questions that are being asked by Mr. Holman, first of all, as I have instructed you, statements, questions, etc[.] of lawyers are not evidence. So that's the first instruction that I want to remind you of.

Secondly, these matters are not being offered for the truth of the matters that are asserted in these alleged complaints. They are being offered, and Mr. Hobart is being questioned, about them to determine the basis of his knowledge or the entire factual context and what he knew in terms of the opinions that he arrived at when he testified on various matters on the Defendant's direct examination.

Id. at 266. After the court gave the instruction, the prosecution asked Hobart about four more complaints. In regards to the last complaint, the prosecutor asked:

Are you aware of a complaint made on October 26 against the Defendant about a woman who was nine months pregnant who said the Defendant would not leave her mail and that her name was on the box?

Id. at 267. Before Hobart could answer, court stated, "[T]hat's enough." Id. The court noted in open court,

... [T]his is not evidence. I have instructed the jury that the statements that Mr. Holman [the prosecutor] are [sic] reading are not evidence. His questions are not evidence. The purpose of these questions are to test the foundation of Mr. Hobart's knowledge on the matters that he testified to on direct regarding whether or not policies were applied differently to the Defendant in this case. They are not being offered into evidence ... and they are not to be considered by you as bearing on the truth of the matters that are asserted in these statements.

Id. at 267–68.

At the next recess, Payne moved for a mistrial on the basis of the questions posed by the prosecutor. The court denied the motion based on its determination that it had cured any errors with the limiting instructions. The court, however, recognized that the prosecutor asked inappropriate questions and admonished him for so doing.[5]

All the remarks were deliberate. They were part of a calculated effort used to evoke strong sympathetic emotions for Christmastime activity, the poor, pregnant women, diaperless children and laid-off employees.

The strength of the competent proofs of guilt is certainly debatable. Evidence relating to the bribery counts was weak, as indicated by a not-guilty verdict on those counts. While there was some proof for the obstruction and desertion of mail counts, the proof was not overwhelming.

5. In this regard, the court stated:

I would only note, Mr. Holman, that this has not been an appropriate course of questioning that you pursued in this kind of evidence. I told you to limit your questions only to those issues that were necessary to probe into Mr. Hobart's knowledge as to why, or lack of knowledge, as to what he knew when he said the policies were being applied unevenly. You went beyond that, sir. I tried to signal you not to go beyond that. I tried to signal you to stop doing it. You didn't. You persisted.

....

... When a judge says to you, Mr. Holman, in the context of your questioning, gives a limiting instruction as I gave, that should be a signal to you. I shouldn't have to do it again.

....

... And I certainly shouldn't have to do it directly.

....

... I told you to limit your question to information sufficient to probe the depths of this witness' knowledge or lack of knowledge in his testimony. You didn't have to get into diapers and nine-month pregnancies and that sort of thing, Mr. Holman.

....

... You have, by persisting in this manner of questioning you've caused a problem. I think I was able to cure it by my repeated instructions to the jury. It was not necessary for you to cause this problem.

Trial Tr. of 12/19/91, Vol. III at 291–92.

Based on the foregoing, we find that the prosecutor's statements rose to the level of being misconduct. This is especially so where the Supreme Court has indicated that a United States Attorney is held to a heightened standard. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *overruled on other grounds, Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The Court stated:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.*

Because the comments and questions are evidence of prosecutorial misconduct, the next step is to determine whether they constitute harmless error. *See Krebs,* 788 F.2d at 1177.

While comments regarding the general plight of poor people were arguably invited by the defense, the comments about people's thoughts and feelings at Christmastime, the comments about children and diapers and nine-month pregnancies, and the comment about the layoffs by General Motors go beyond anything in the evidence or anything invited by the defense. We find that they amount to prosecutorial misconduct which permeated the whole trial and prejudiced the defendant. Throughout the trial, Payne was not only having to defend against the charges in the indictment; he was also having to defend against being cast as a man who is insensitive to laid-off workers, to helpless children, to pregnant women, and to the general goodwill of people that develops around Christmastime.

The government notes that the district court sustained objections to those comments, gave timely limiting instructions, and gave further instructions to the jury,[6] all with the intention of totally dissipating any harm done by the misconduct. In many cases, such efforts can make the misconduct harmless. *See, e.g., Leon,* 534 F.2d at 679 (when jury is given a cautionary instruction designed to overcome or dissipate any prejudice that may have been caused, the error may be harmless); *United States v. Williams,* 822 F.2d 512, 518 (5th Cir.1987) ("even if the prosecutor's comments were improper, we are persuaded that [the defendant's] rights were not substantially prejudiced, since his contemporaneous objections were sustained"). "However, an error may be so prejudicial that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect." *United States v. Solivan,* 937 F.2d 1146, 1156 (6th Cir.1991); *cf. Stahl,* 616 F.2d at 33 (in a case where the prosecutor continually engaged in a course of conduct designed to equate wealth with wrongdoing and to appeal to the potential bias of not-so-wealthy jurors against a very wealthy entrepreneur, the court held that the prosecutorial misconduct amounted to prejudicial error and stated that this case is not "one in which curative instructions by the trial court were sufficient to eliminate the taint").

Although the district court sustained an objection to the comment in the opening statement, gave limiting instructions when the improper questions were asked during cross-examination, sustained objections to improper questions during closing, and gave further instructions during its charge to the jury, we find that the court's action, while commendable, did not eradicate the harm that was already done to Payne. The errors

---

6. During jury instructions, the district court told the jurors not to base their verdict "on sympathy[,] bias or prejudice," and reminded them that the "lawyers' statements and arguments" were not evidence. J.A. at 190–91.

in this case were so prejudicial and persistent that no cautionary instruction could dissolve their effect. As a result, the judgment of conviction must be reversed.

### V.

For the foregoing reasons, we reverse Payne's conviction and remand for further proceedings.[7]

WELLFORD, Senior Circuit Judge, concurring.

This is a close and difficult case on the merits of these convictions at issue. I am in full agreement with parts I, II, and III of the opinion. I concur in part IV, but emphasize that I am satisfied that defendant's counsel did open the door to a searching cross-examination of witness Hobart, who testified on direct examination for Payne, that he was "subject to different policies."[1] I believe it was appropriate for the prosecutor to question Hobart about his familiarity with complaints made by patrons against Payne. The prosecutor, however, went too far in posing certain cross-examination questions, but it was defendant who sought to raise the specter of race in this case in order to justify his questionable conduct as a mail carrier in dealing with numbers of black patrons on his route. The prosecutor's excessive zeal in this area, in my view, would not constitute reversible error except for his other misconduct described fully in the court's opinion.

"The touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). We look to see whether the prosecutor's conduct was "so egregious so as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir.), *cert. denied*, 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979). Under

all the circumstances, the prosecutor's conduct did render the trial and conviction fundamentally unfair.

---

7. Payne also argues that the bribery counts, the obstruction of mail counts and the desertion of mail count should have been severed from each other. Because of the disposition of this case, we decline to address the merits of this issue. Furthermore, we note that by not renewing his objection at the end of the evidence, Payne may have failed to preserve this issue for appeal. *See*

*United States v. Swift*, 809 F.2d 320, 323 (6th Cir.1987).

1. The district judge described Hobart's claim that "policies were being applied unevenly" as to Payne. When a defendant charges, in effect, selective prosecution because of race, this presents sensitive problems for the prosecutor.