48 F.3d 190
 UNITED STATES of America, Plaintiff-Appellee,
v.
Delores RUPERT (93-2373); Michael Hall (93-2380); and
Amelia Ramon (94-1105), Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
Charles CARLISLE (93-2470), Defendant-Appellee.
 Nos. 93-2373, 93-2380,
93-2470 and 94-1105.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 6, 1994.
Decided Feb. 21, 1995.
 
 James R. Redford (argued and briefed), Office of the U.S. Atty., Grand Rapids, MI, for plaintiff-appellee.
 Victor L. Bland (argued and briefed), Kalamazoo, MI, for Delores Marie Rupert.
 Lawrence J. Phelan (argued and briefed), Grand Rapids, MI, for Michael Hall.
 Scott Graham, Gemrich, Moser, Bowser, Fette & Lohrmann, Kalamazoo, MI, Joel R. Myler (argued), James A. Christopherson, (briefed), Blakeslee, Chambers, Peterson, Dalrymple & Christopherson, Traverse City, MI, for Charles Carlisle.
 Kenneth M. Mogill (argued and briefed), M. Jon Posner, Mogill, Posner & Cohen, Detroit, MI, for Amelia Ramon.
 Before: BROWN, RYAN, and BOGGS, Circuit Judges.
 BOGGS, Circuit Judge.
 
 
 1
 Rupert, Ramon, and Hall appeal their convictions for conspiracy to possess marijuana with the intent to distribute, in violation of 21 U.S.C. Secs. 841 and 846. The government appeals the court's granting of Carlisle's motion for acquittal. We affirm the convictions of Rupert, Ramon, and Hall, and reverse Carlisle's acquittal. Our discussion of the issues presented by Rupert, Ramon, and Hall is contained in an unpublished appendix to this decision.
 
 
 2
 * The government argues on appeal that the district court lacked jurisdiction to acquit Carlisle.
 
 
 3
 On July 13, the jury convicted Carlisle, along with the other defendants before us, of one count of conspiracy to possess marijuana with intent to distribute. On July 23, Carlisle filed a motion for judgment of acquittal. The seven-day period in which Carlisle could move for acquittal under Fed.R.Crim.P. 29 does not include weekends, so it lapsed on July 22. The district court denied Carlisle's motion on August 24, 1994.
 
 
 4
 When Carlisle appeared for sentencing on October 14, however, the court on its own motion reversed its earlier decision and granted Carlisle's motion for acquittal.[1] The court wrote: "I do not believe that a rational trier of fact could find beyond a reasonable doubt, as the jury was instructed in Instruction 10B it must, that Carlisle knowingly and voluntarily joined the conspiracy." The district court held that the evidence was insufficient to convict under Jackson v. Virginia. Following the Sixth Circuit's decision in United States v. Burgess, 931 F.2d 893 (6th Cir.1991) (Table), 1991 WL 66056, and United States v. Pearce, 912 F.2d 159 (6th Cir.1990), cert. denied, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991), the district court found that the government failed to prove that Carlisle entered into an agreement.
 
 
 5
 Under Rule 29, it is beyond the court's jurisdiction to grant an untimely motion for acquittal. Furthermore, it is beyond a court's jurisdiction to enter a judgment of acquittal sua sponte after the case has been submitted to the jury. Fed.R.Crim.P. 29; United States v. Davis, 992 F.2d 635, 640 (6th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 265, 126 L.Ed.2d 217 (1993); see also United States v. Dennard, 7 F.3d 235 (6th Cir.1993)(Table), 1993 WL 351742.
 
 
 6
 In Davis, as here, the district court initially denied defendant's motion for acquittal. At sentencing, however, the court, as here, reversed its previous decision, asserting that it had the inherent authority to consider a judgment of acquittal after the discharge of the jury "if necessary to correct manifest injustice." Id. at 637. On appeal, we ruled that a district court does not have such inherent authority. Id. at 638. We noted that there is no provision in Rule 29 that allows a court to act on its own initiative after the case is submitted to the jury. Id. at 639. However, under Rule 29(c), if Carlisle had moved for acquittal within seven days of the discharge of the jury (or later, if the court so allowed during that seven-day period), it would have been within the court's jurisdiction to grant Carlisle's motion for acquittal.
 
 
 7
 The district court lacked the jurisdiction to acquit Carlisle. We therefore must reverse the judgment of acquittal.
 
 II
 
 8
 In conclusion, we affirm the convictions of Ramon, Rupert, and Hall. However, we reverse Carlisle's judgment of acquittal and remand for the district court to reinstate the jury's verdict and for sentencing.
 
 
 9
 LOWS******
 
 APPENDIX
 NOT RECOMMENDED FOR PUBLICATION
 Nos. 93-2373, 93-2470, 94-1105, 93-2380
 UNITED STATES COURT OF APPEALS
 FOR THE SIXTH CIRCUIT
 
 10
 United States of America, Plaintiff-Appellee.
 
 
 11
 v.
 
 
 12
 Dolores Rupert, Michael Hall, Amelia Ramon, Defendants-Appellants.
 
 
 13
 United States of America, Plaintiff-Appellant,
 
 
 14
 v.
 
 
 15
 Charles Carlisle, Defendant-Appellee.
 
 
 16
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN
 
 
 17
 Before: BROWN, RYAN and BOGGS, Circuit Judges.
 
 
 18
 * This appendix to the published opinion in this case contains our discussion of the facts and the issues raised in the appeals of Rupert, Ramon, and Hall.
 
 
 19
 On April 8, 1993, authorities stopped Thomas Crawford and found 289 pounds of marijuana in his rented truck. Crawford agreed to cooperate with police, admitting he was delivering the drugs to Battle Creek, Michigan. Police flew Crawford and the drugs to Battle Creek on April 9 to complete the delivery in a different rental truck.
 
 
 20
 Once he arrived in Battle Creek on April 10, Crawford called Ramon at about 1:00 a.m. In the morning, Crawford met with Ramon and Rupert (Ramon's daughter) at his hotel. Ramon and Rupert came back to Crawford's hotel that evening and Crawford, in the rental truck, followed Rupert and Ramon, with Rupert driving, to Rupert and Carlisle's house. When Crawford attempted to park in the driveway, Rupert told him not to, because Carlisle (Rupert's common-law husband) had reported hearing police in the area on his scanner. Carlisle, Ramon, and Crawford moved the truck to another location about 15 minutes away, with Carlisle driving a car and Crawford following in the truck. Crawford and Ramon next went to a hotel to discuss with other conspirators how to unload the drugs from the truck. Crawford returned to his hotel in the early morning of April 11 by taxicab.
 
 
 21
 Later that morning, Ramon rented a storage locker at a nearby facility in Battle Creek, Michigan. Hall and Ramon were spotted by surveillance police later that same day conducting their own surveillance in a blue and white Monte Carlo[1] as the truck was driven (by Timothy Smith)[2] to the storage facility. Hall was driving the Monte Carlo, with Ramon as a passenger. Officers observed the Monte Carlo drive down Michigan Avenue past the storage facility, make a U-turn, stop at a red light, remain stopped at the light after it had turned green, drive toward the storage facility, brake as though to turn into the facility, and then swerve back onto the street. Police were arresting Smith in front of the storage facility, and the Monte Carlo appeared to swerve away on spotting this arrest.
 
 
 22
 Ramon and Hall were then arrested. Hall was convicted and sentenced to 60 months of imprisonment and four years of supervised release; Ramon was convicted and sentenced to 63 months of imprisonment and four years of supervised release; and Rupert was sentenced to 60 months of imprisonment and four years of supervised release.
 
 II
 
 23
 Ramon, Rupert, and Hall (hereafter Appellants) raise a number of issues on appeal. However, we find that none of these issues justify reversal of their convictions.
 
 
 24
 First, Appellants argue that the court's instruction to the jury accompanying the admission of Israel Ambriz's plea agreement amounted to improper vouching. Ambriz was a co-conspirator who pled guilty and testified at trial. During trial, the government sought to admit as evidence Ambriz's plea agreement. Carlisle's counsel objected, arguing that the plea agreement stated that Ambriz would testify truthfully, and that this statement vouched for Ambriz. The court offered a curative instruction to the jury when reading the plea agreement.
 
 
 25
 After reading a passage that said "[t]he defendant agrees to participate and cooperate truthfully ... [h]e will testify truthfully if called upon to do so ...," the judge added:
 
 
 26
 Also, the word truthfully is used. It is going to be used several times in this agreement. That is something between the government and the defendant. It does not mean that the defendant is testifying truthfully or untruthfully. That is for you to decide.
 
 
 27
 As I said in the beginning of this trial, for this witness or any witness it is going to be your determination as to whether the person testified truthfully or untruthfully. So the fact that the word "truthfully" is in there, it has nothing to do with you. It only has to do with what the government believes, and that is irrelevant to you. We don't care what the government believes. We care what you believe.
 
 
 28
 After reading the next passage, which contained the condition that Ambriz testify truthfully or void his plea agreement, the judge added:
 
 
 29
 Once again that paragraph is a requirement or a contractual agreement between the defendant and the government which is not only not binding on you, but your determination of his truthfulness is yours alone. It is not supported in any way by an agreement, this witness, this exhibit, and other exhibit. So don't be mislead by the word "truthful" which does appear several times in that paragraph.
 
 
 30
 No counsel objected following the reading of the plea agreement and these additional instructions. Appellants argue on appeal that the judge's instruction vouched for the witness's credibility.
 
 
 31
 We reverse a jury verdict only if the imputed vouching "permeate[d] the entire atmosphere of the trial." United States v. Payne, 2 F.3d 706, 712 (6th Cir.1993)(quotations omitted)(per curiam). "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); see also United States v. Carroll, 26 F.3d 1380 (6th Cir.1994).
 
 
 32
 We find that the jury instructions were not erroneous. The slightly awkward wording of a small part of the curative instruction did not vouch for Ambriz's veracity so obviously as to call into question the trial's results. We cannot find that the instructions, taken as a whole, confused the jury or prejudiced either Ramon or Hall. The trial court stated repeatedly, in opening instructions, in the charge to the jury, and in these curative instructions, that the jury was responsible for determining Ambriz's truthfulness, not the government.
 
 
 33
 Second, Appellants argue that the prosecution's argument that a witness was being "honest" constituted improper vouching. In his rebuttal argument, the prosecutor stated:
 
 
 34
 These people work in secret. They work in the dark. They keep their identities hidden because of the possibility of being prosecuted. And they did it in this case. And the way that you get into these organizations is through cooperating informants like Crawford. And, yes, he was testifying to try to help himself out. And I think if he had sat up here and said, oh, I just realized that what I did was totally wrong and that is why I am here--he was very candid, ladies and gentlemen, that he was trying to help out himself and his family. I think that was an honest response because he was telling me the truth about why he was doing it. But I also think that he, that examination of his testimony is, should reveal that he was being candid while he was testifying here on the stand.
 
 
 35
 Appellants argue that the phrase "I think that was an honest response because he was telling me the truth about why he was doing it" is improper prosecutorial vouching. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); United States v. Daniels, 528 F.2d 705, 709 (6th Cir.1976). No counsel objected to this statement during trial. Absent objection by either side, the appellate standard of review is for plain error. This standard "is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)(citing United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).
 
 
 36
 The government urges us to view the prosecutor's comment as an "invited response." The government claims that the prosecutor was rehabilitating Crawford after his motivations had been attacked by Ramon's counsel in his closing argument. This court examines whether a comment is an "invited response" along with the rest of the record, to determine what impact the comment had on the entire proceedings. Young, 470 U.S. at 11, 105 S.Ct. at 1044; United States v. Bond, 22 F.3d 662, 667-68 (6th Cir.1994)("Proper context includes defense counsel's conduct as well as the nature of the prosecutor's response, i.e., the "invited response."); United States v. Payne, 2 F.3d 706, 715 (6th Cir.1993)(holding that misconduct permeated entire trial, reversing conviction).
 
 
 37
 The prosecutor's statement in this case was not so prejudicial as to justify reversing the judgment against Appellants. The government produced ample evidence to find each defendant guilty. Furthermore, the prosecution's remarks to some extent "righted the scales" following Ramon's counsel's attack on Crawford. This court has stated that plain errors "are limited to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987), cert. denied, 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988). Therefore, viewing the entire record, admission of this short statement did not lead to an unjust result that would justify reversal under Causey.
 
 
 38
 Third, Appellants argue that the admission of the street value of the marijuana was reversible error. The prosecution called Detective Thompson to testify. After establishing to the court's satisfaction that Thompson could offer an opinion as a lay witness under Fed.R.Evid. 701, the prosecution had Thompson testify to the street value of the marijuana seized from the truck. Thompson testified that the street price per pound of marijuana in Battle Creek on April 11, 1993 was $1,800 a pound. The court ruled that this evidence was relevant to meet their burden of demonstrating the defendants' intent to distribute the drugs.
 
 
 39
 Appellants argue that Thompson's testimony was unnecessary to prove this element of the government's case. They note that personal use had not been raised as a defense. Furthermore, the fact the government seized 289 pounds would provide circumstantial evidence of an intent to distribute. Appellants argue that the price information was more prejudicial than probative, and should not have been admitted under Fed.R.Evid. 403.
 
 
 40
 Appellants also argue that Detective Thompson should not have been allowed to offer his opinion about the price of drugs in Battle Creek. Evidence was produced at trial that Thompson had worked in law enforcement on drug cases for many years, but had never made a buy himself, and had to rely on what other officers had told him about the price of marijuana. He had not been qualified as an expert in any prior proceeding, nor did he know anyone who had been qualified as an expert in marijuana pricing.
 
 
 41
 We find no error in admitting this evidence. The court considered carefully the Rule 403 issue in conference during the trial. The court noted that police officers may testify to the value of drugs when this evidence is relevant, citing United States v. Warren, 972 F.2d 349 (6th Cir.1992)(Table), 1992 WL 168099. The district court observed that this kind of evidence was especially probative in cases like the present one where "there is no direct evidence of what was going to happen to the marijuana.... Therefore, I think its probative value is very high in this case, and because it is so high, I believe it outweighs the possibility of unfair prejudice."
 
 
 42
 Furthermore, the court below correctly determined that the government may introduce evidence of street value as circumstantial evidence of intent. See Warren, 1992 WL 168099. Police may give an expert opinion on various criminal practices, if properly qualified under Rule 702. United States v. Brown, 878 F.2d 382 (6th Cir.1989)(Table), 1989 WL 71998 (citing United States v. Johnson, 575 F.2d 1347, 1360 (5th Cir.1978)(drug price); United States v. Evans, 883 F.2d 496 (6th Cir.1989)(drug appointment book); United States v. Woods, 568 F.2d 509, 514 (6th Cir.), cert. denied, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978)(drug vocabulary). However, in this case the officer apparently testified as a lay witness under Rule 701. We determine that any error here is harmless, because Thompson could have been certified as an expert under Rule 702.
 
 
 43
 Fourth, Appellants argue that the admission of testimony about countersurveillance techniques was reversible error. The prosecutor called DEA Agent Munson to testify. Munson testified that he had trained in countersurveillance with Customs, DEA and Naval Investigative services. Munson testified he also had on-the-job experience with surveillance and countersurveillance. However, he had never been certified as a countersurveillance expert in court. Appellants objected to Munson's qualification as an expert in countersurveillance, noting that countersurveillance is not an expertise with standards that an expert could assist the jury in understanding. The court ruled that Munson was qualified to testify as an expert regarding countersurveillance under Rule 702, citing United States v. Pearce, 912 F.2d 159, 163 (6th Cir.1990), cert. denied, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991), and United States v. Daniels, 951 F.2d 350 (6th Cir.1991)(Table), 1991 WL 278797 (allowing courts to admit expert testimony on countersurveillance).
 
 
 44
 On appeal, Hall also argues that the court erred by allowing Munson to testify that Hall was "conducting surveillance." Hall argues that this testimony contains a legal conclusion reserved for the jury and was not helpful to the jury. However, a review of the record indicates that Hall's counsel did not object when Munson expressed the opinion that Hall was conducting countersurveillance.
 
 
 45
 Admission of expert testimony "is a matter within the broad discretion of the court, and a decision to admit such testimony is to be sustained unless manifestly erroneous." United States v. Pearce, 912 F.2d 159, 163 (6th Cir.1990), cert. denied, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991). Hall's separate issue, whether the court erred by admitting Munson's statement that Hall was conducting countersurveillance, is reviewed for plain error.
 
 
 46
 We find that the district court's decision to qualify Munson as an expert and allow him to testify was well with the trial court's broad discretion. Nor was it plainly erroneous for the trial court to permit Munson to say that Hall had engaged in countersurveillance. This is just the kind of opinion that a qualified expert can make, and is very helpful to the jury.
 
 
 47
 Fifth, Rupert argues that the admission of her "hearsay" statement against her violates Vinson. However, Rupert is attacking the admission of her own statement. The statement is admitted, not for the truth of the matter it asserts, but for the fact she made it, and is relevant to show her involvement in the scheme. Her statement is therefore not hearsay.
 
 
 48
 Sixth, Hall claims that the government presented insufficient evidence that he knowingly participated in the conspiracy. Hall notes that the government never produced evidence that Hall had been told of the marijuana in the truck, or of any prior relationship he might have had with Ramon. Hall argues that his actions are just as consistent with a conspiracy to transport stolen goods, as to transport drugs.
 
 
 49
 We find that the government produced sufficient evidence that Hall knowingly participated in the conspiracy to satisfy Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Hall drove the Monte Carlo in a countersurveillance manner as documented by the testimony of three law enforcement officers. Hall drove with Ramon, who played the central role in the conspiracy.
 
 
 50
 We note that there is more evidence here to show an agreement than in this court's Pearce decision. Pearce, 912 F.2d at 159. In that decision, this court held that the defendant's presence in a crack house was insufficient to convict him of a drug conspiracy charge. Hall's involvement goes beyond mere association with conspirators, because he drove a vehicle in apparent countersurveillance. Such precautions would not be necessary unless apprehension carried with it severe punishment. The evidence shows that Hall was no mere passenger or visitor. We do not overturn a conspiracy conviction unless there is insufficient evidence from which a rational jury member could find beyond a reasonable doubt that the defendant was a member of the conspiracy. Pearce, 912 F.2d at 161.
 
 
 51
 Seventh, Rupert and Hall argue that the court erred in determining that Rupert or Hall could foresee that as much as 300 pounds of marijuana were involved in the conspiracy.
 
 
 52
 At sentencing, the district court considered the relevant conduct of Hall and Rupert under U.S.S.G. Sec. 2D1.1. The court determined that both Rupert and Hall were responsible for the entire shipment of marijuana, 289.11 pounds, or about 107 kilograms. The district court noted that this circuit has determined that a conspirator is accountable for the full amount of the drugs involved in the conspiracy if the amount was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal activity. United States v. Jenkins, 4 F.3d 1338, 1346 (6th Cir.1993), cert. denied, --- U.S. ----,114 S.Ct. 1547, 128 L.Ed.2d 197 (1994). Under the Drug Quantity Tables, U.S.S.G. Sec. 2D1.1(c), a conspiracy involving from 80-100 kg of marijuana would receive a base level of 24, while an amount from 100-400 kg would receive a base level of 26. Hall received a base level of 26. The court reduced Rupert's offense level two points for minimal involvement, for a base level of 24.
 
 
 53
 The district court's decision on the amount of drugs for which a defendant is accountable is a finding of fact reviewed under the "clearly erroneous" standard. United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990). We find that the court did not err by holding Rupert and Hall responsible for the entire shipment. Given the entire record of Rupert's involvement and close association with several steps in the conspiracy, we cannot find that the trial court committed clear error by determining that Rupert could reasonably foresee that the truck could contain as much as 289 pounds of marijuana.
 
 
 54
 Hall argues that the evidence produced at his sentencing that he was going to be paid $2000 to drive Ramon to the storage facility, should be used to calculate the scope of the conspiracy he had joined. Hall urges that $2000 would convert to only two pounds of marijuana or a level 8 offense. Rather than adopt Hall's interpretation of his $2000 fee, we find that if he was to be paid this much for a couple of hours of work, he could foresee that he would be involved in illegal activity. It was not clearly erroneous for the court below to determine that Hall was responsible for the truckload of marijuana.
 
 
 55
 Therefore, we find that the arguments raised by Rupert, Ramon, and Hall are without merit, and we affirm their convictions.
 
 
 
 [1]
 The court noted in footnote 1 of its Opinion:
 The government correctly points out that ... defendant's motion was filed on July 23. However, I can conceive of no prejudice to the United States which will result from consideration of a motion that is one day late in this case. Because I believe that refusal to hear this motion would result in grave injustice, and because the Rule permits the court to extend the deadline, I will consider this motion as if it were filed in a timely manner.
 
 
 [1]
 Earlier that afternoon the blue and white Monte Carlo had been observed "cleaning" with a Pinto in the area. Agent Munson testified as an expert in countersurveillance, and identified this as countersurveillance activity
 
 
 [2]
 At trial, Smith moved for a directed verdict. The court granted his motion, finding that the government had produced insufficient evidence that he had knowingly and voluntarily joined the conspiracy