**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenneth A. WEINER (91–1551) and**
**Steven M. Lewin (91–1582),**
**Defendants–Appellants.**

**Nos. 91–1551, 91–1582.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 20, 1992.

Decided March 11, 1993.

Sheldon Light (argued and briefed), John R. Roth, Asst. U.S. Atty., Detroit, MI, for plaintiff-appellee.

Richard M. Lustig (argued and briefed), Lustig & Friedman, Birmingham, MI, for defendants-appellants.

Before: NORRIS and SILER, Circuit Judges, and EDGAR, District Judge.[*]

SILER, Circuit Judge.

Defendants, Kenneth A. Weiner, Steven M. Lewin, and Alvin B. Gendelman (now deceased), were convicted, after a trial lasting almost four months, of several counts which included wire fraud, 18 U.S.C. § 1343; mail fraud, 18 U.S.C. § 1341; interstate transportation of property taken by fraud, 18 U.S.C. § 2314; conspiracy to defraud the United States, 18 U.S.C. § 371; and filing false income tax returns, 26 U.S.C. § 7206(1). Weiner was convicted on all counts submitted to the jury against him, Lewin was convicted of all but one count submitted against him, and Gendelman was convicted on all but five counts submitted against him. Weiner was sentenced to an aggregate term of ten years on his convictions, and the other two defendants were sentenced to three years. Because of Gendelman's death, this appeal only involves the convictions of Weiner and Lewin. Defendants have raised many issues, including whether the district court, 755 F.Supp. 748, erred by allowing the introduction of evidence concerning Weiner's cooperation with the government, the results of a polygraph examination of Weiner, opinion evidence by an FBI agent concerning Weiner's credibility, civil judgments obtained against Weiner by victims of the fraudulent scheme, and co-conspirator hearsay statements. In addition, the defendants have asserted that the district court should have granted a severance and erred in its jury charge by failing to instruct on multiple conspiracies and failing to explain willfulness in filing the false tax returns. For reasons stated herein and in the unpublished appendix, we affirm the judgment of the district court.

■ Defendants carried out a "Ponzi" scheme to defraud investors. A "Ponzi" scheme is fraud which requires an increasing stream of investors to fund obligations to the earlier investors, with a resulting pyramiding of the liabilities of the enterprise. The name comes from Charles Ponzi, a swindler who devised such a scheme around 1919. *See United States v. Shelton,* 669 F.2d 446, 449 n. 1 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). The scheme in this case began in the early 1980s and continued until about April, 1986. As part of the scheme, the defendants induced victims to take part in various purported investment propositions, including gold, silver, diamonds, real estate ventures, Sony franchises and steel. Many of the investments were premised on a large return, typically ten percent per month. The investments had no economic substance, and the returns that were paid to some investors came from funds contributed by other investors. Moreover, no transactions were reported to the Internal Revenue Service, so investors could profit without paying income taxes on their gains.

Weiner originated the scheme in 1981, acting in concert with Charles Laven, now deceased. Laven was replaced in the scheme in 1983 by Gendelman, who was originally an investor. Gendelman then became the sales manager, attracting investors. Lewin joined the scheme and brought in investors, but was also responsible for managing the finances of the scheme, by working some of the banking transactions that were necessary to keep the scheme operative. Defendants represented to investors that Weiner was connected with a clandestine multi-national group, a cartel of large international corporations that purportedly had the power to provide investment opportunity and returns. Several prominent businessmen and professionals, such as doctors and lawyers, invested and lost large sums of money in the scheme. Weiner's credibility was enhanced by the fact that he was the Third Deputy Chief of the Detroit Police Depart-

[*] The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennes-see, sitting by designation.

ment, a political appointment and the highest civilian position within the Department. He also had held teaching positions at Wayne State University and the University of Michigan. Some 90 investors put money into the scheme, which took in funds in excess of $10,000,000.00. The income tax charges arose from the fact that Weiner and Lewin both significantly understated their taxable incomes for tax years 1984–86. Each of them primarily reported their income from their regular jobs and failed to report the additional income from the fraudulent scheme.

The scheme collapsed in 1986 when Weiner stopped paying returns to investors and became hard to reach. In May, 1986, the Federal Bureau of Investigation (FBI) began its investigation of the investment scheme. The investigation lasted until October, 1986, when it was suspended because Weiner had approached the government with allegations of corruption on the part of Detroit Mayor Coleman Young, and offered to cooperate in the investigation of these allegations. He was used by the FBI in investigating Mayor Young and others, but the investigation was later terminated without any charges placed against the Mayor when the FBI concluded that Weiner was not being truthful with it.

Weiner's defense was that the investment scheme was ruined by the embezzlement of the middlemen involved in the transactions, which included Lewin and Gendelman, because they took large commissions and spent some of the money on personal items. On the other hand, Lewin and Gendelman maintained that they were victims of Weiner and should not be co-defendants, because they were duped, like the other investors. All the defendants filed pretrial motions for severance under Fed.R.Crim.P. 14, and the motions were renewed during the trial because of antagonistic defenses, but the court denied the motions.

## I.  EVIDENCE OF COOPERATION BY WEINER WITH THE FBI

■ Counsel for Gendelman and Lewin sought to introduce evidence concerning Weiner's cooperation in the investigation of Mayor Young, to show Weiner's "manipulative ability" and "unique skills," to demonstrate their lack of intent in the scheme. Weiner objected to the introduction of this, as it occurred after the scheme had terminated. The prosecution also objected, but the court advised the parties that the evidence was relevant and required advance notice of the playing of the taped recorded conversations by Weiner, so that any prejudicial portions could be deleted.

This evidence first arose in trial when FBI Special Agent Thomas Cannistra testified for the prosecution. On cross-examination by counsel for Gendelman and Lewin, the court permitted questions concerning Weiner's cooperation with the government. Cannistra testified that Weiner had secretly taped conversations with Mayor Young on four occasions in the fall of 1986 before he began taping on behalf of the FBI. Thereafter, the FBI had him record 39 conversations with Mayor Young between February 19 and May 19, 1987. The Internal Revenue Service then took over the investigation and had 40 more recordings made by Weiner. Cannistra also testified that Mayor Young had large stashes of money, gold and precious stones in his mansion and that he had invested $400,-000.00 with Weiner between 1983–86. Cannistra further stated that he went to California and Georgia with Weiner to look in some safe deposit boxes which contained gold coins belonging to Mayor Young.

However, none of the taped conversations between Weiner and Young were played at trial until Weiner took the stand. Weiner testified at length about his investing on behalf of Mayor Young during the time of the scheme and how he later cooperated with the FBI in taping conversations with the Mayor. During this testimony, his counsel played nine of the recordings he had made and he commented on what happened in connection with those conversations.

■ Weiner asserts that it was error for the court to have admitted this evidence, as it did not come within the purview of Fed.

R.Evid. 404(b).[1] The district court carefully considered the provisions of the rule, and allowed the evidence to be introduced to show the lack of intent on the part of the codefendants, Lewin and Gendelman. The prosecution now asserts that it could have introduced these other acts to show the existence of a larger continuing plan, scheme or conspiracy, of which the conspiracy on trial was a part, citing *United States v. Passarella*, 788 F.2d 377 (6th Cir.1986). It would have been a valid use. The trial court has broad discretion to determine whether evidence of other acts is admissible against a defendant in a criminal case. *See, e.g., United States v. Ebens*, 800 F.2d 1422, 1433 (6th Cir.1986). Moreover, it would not be outweighed by prejudice, for the evidence demonstrated the cooperation of the defendant with the FBI in ferreting out crimes involving public officials. Finally, there would have been very little evidence in the trial on this point, had Weiner let it rest after cross-examination of the FBI agent by defense counsel. When he introduced the recordings during his testimony in chief, his counsel pursued a deliberate trial strategy which failed. *See United States v. Zalman*, 870 F.2d 1047, 1056 (6th Cir.), *cert. denied*, 492 U.S. 921, 109 S.Ct. 3248, 106 L.Ed.2d 594 (1989). Therefore, Weiner waived any objection that he might have had to the recordings, when he elected to introduce them in his own case in chief.

## II. RESULTS OF POLYGRAPH EXAMINATION

■ During the direct examination of Weiner, his counsel moved in limine to prevent the prosecution from questioning Weiner regarding polygraph examinations he had taken during his cooperation with the FBI. The court ruled that the prosecution could question Weiner about the examinations, not to prove that he had lied, but because Weiner had opened the door for an explanation of the government's conduct in

the investigation, and its efforts to determine Weiner's credibility. On direct, Weiner testified that in May, 1987, his cooperation with the FBI broke down because they had a disagreement. The prosecution wanted to show that the parting between Weiner and the FBI was because the FBI asked Weiner to take a polygraph examination and discontinued using him after the results of the examinations indicated deception on Weiner's part. When the court ruled that the government could examine Weiner about the examinations, Weiner's counsel elicited testimony on direct regarding the polygraph examination and the fact that he had passed one examination and failed another. The prosecution covered the matter briefly on cross-examination and counsel for Lewin also cross-examined the defendant on the issue, reciting some of the questions posed in one of the polygraph examinations. The court gave a limiting instruction at the time of the cross-examination by the government and also during jury instructions at the conclusion of the trial.

■ Ordinarily, polygraph examination results are inadmissible as evidence. *Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir.1987), *cert. denied*, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). However, there are some circumstances under which polygraph evidence may be admissible. *See United States v. Barger*, 931 F.2d 359, 370 (6th Cir.1991). Here, the prosecution could have only shown that Weiner took the examinations and, as a result, he was no longer used by the FBI. This was not to prove that he had lied in his answers to the questions, but to show why he was no longer being used as an informant. Most of the evidence pertaining to the polygraph examination was again the result of a deliberate trial strategy. Therefore, we find no error in the limited use of the polygraph evidence. *See Zalman*, 870 F.2d at 1056.

---

1. Fed.R.Evid. 404(b) provides:
   **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absent of mistake or accident.

## III. FAILURE TO GRANT A SEVERANCE

■ Defendants Weiner and Lewin moved for severance before trial and renewed the motions during the trial and at the conclusion of the evidence, under Fed. R.Crim.P. 14. Defendant Lewin also argued on appeal that he was improperly joined under Fed.R.Crim.P. 8(b), but that issue was not raised in the district court. A Rule 14 severance motion does not preserve a Rule 8 misjoinder objection. *United States v. Scaife*, 749 F.2d 338, 344 (6th Cir.1984). Therefore, the misjoinder argument under Rule 8 was waived.

■ With regard to the issue of severance under Rule 14, a district court's denial of a motion under that Rule should be reversed only for an abuse of discretion. *United States v. Davis*, 809 F.2d 1194, 1207 (6th Cir.), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987). In addition, "the general rule is that parties who are jointly indicted should be tried together." *Id.* That is particularly true when the defendants are joined in a conspiracy or joint participation in a common scheme. *See United States v. Horton*, 847 F.2d 313, 317 (6th Cir.1988).

■ The primary contention of the defendants for a severance is that there were antagonistic defenses and that each defendant pointed to another to absolve himself. However, even if defendants have antagonistic defenses, in order to prevail on a motion to sever, a defendant must show that the antagonism will mislead or confuse the jury. *United States v. Benton*, 852 F.2d 1456, 1469 (6th Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988). Even if there is some potential jury confusion, "such confusion must be balanced against society's interest in a speedy and efficient trial." *Id.* The defendant carries the heavy burden of making a strong showing of prejudice. In this case, the prejudice which was asserted is that had Weiner been severed from the case against the codefendant, the evidence concerning his cooperation with the FBI in acting as an undercover agent would never have been introduced, as it was brought out by counsel for the codefendants. In addition, some of the evidence concerning the polygraph results may not have been introduced. However, Weiner introduced most of that evidence in his own case in chief, and the prosecution might very well have taken a different approach to the case had the codefendants not been on trial with Weiner. Nevertheless, there was no confusion or misleading evidence which was so prejudicial to require the district court to be reversed for denying the motion to sever.

■ Another contention by Lewin is that there was overwhelming evidence against Weiner, so he should not have been tried jointly with Weiner, as there was much evidence about transactions in which Lewin did not participate. Nevertheless, all the transactions involved the conspiracy and the common scheme. The disparity of evidence against defendants is not sufficient by itself to warrant a severance. *See Davis*, 809 F.2d at 1207.

The district court, therefore, did not abuse its discretion in denying the motion to sever under Rule 14.

## CONCLUSION

For reasons stated herein and in the unpublished appendix, we find no error in the issues raised by the defendants on appeal. This was a complicated and lengthy trial, and the evidence against the defendants was overwhelming. Thus, the judgment of the district court is AFFIRMED.