UNITED STATES of America, Plaintiff–Appellee,

v.

Dexter O'Bryant BOND (92–2266); Ervin Brown, Jr. (92–2268); and Larry Walker, Jr. (92–2269), Defendants–Appellants.

Nos. 92–2266, 92–2268 and 92–2269.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1993.

Decided April 22, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied June 8, 1994.

Patricia G. Blake (argued and briefed), Office of the U.S. Atty., Detroit, MI, James A. Brunson, Asst. U.S. Atty., Office of the U.S. Atty., Bay City, MI, for U.S.

Arthur M. Fitzgerald (argued and briefed), Bay City, MI, for Dexter O'Bryant Bond.

Robert J. Dunn (argued and briefed), Bay City, MI, for Ervin Brown, Jr.

Steven J. Jacobs (argued and briefed), Bay City, MI, for Larry Walker, Jr.

Before: BOGGS and SUHRHEINRICH, Circuit Judges; and WEBER, District Judge.[*]

SUHRHEINRICH, Circuit Judge.

In this consolidated appeal, defendants Dexter Bond, Ervin Brown, Jr., and Larry Walker, Jr., appeal their convictions and sentences for conspiracy (18 U.S.C. § 371) and armed bank robbery (18 U.S.C. § 2113(d)) following a jury trial. Defendants raise a number of issues on appeal related to their convictions, including denial of Walker's motion for severance, insufficiency of the evidence as to defendants Bond and Brown, and prosecutorial misconduct relating to both Bond and Brown; and to the sentences imposed, including improper use of a prior conviction in calculating Walker's criminal history score, upward departures in all three cases based upon extreme psychological injury and use of weapons and dangerous instrumentalities, and abuse of discretion in calculating Bond's criminal history score. Those issues concerning the district court's sentencing determinations have merit. We therefore **AFFIRM** all three convictions, **VACATE** defendants' sentences, and **REMAND** for resentencing.

## I.

### Facts

On Friday, November 30, 1990, four armed men wearing ski masks and dark clothing robbed the Wanigas Federal Credit Union in Saginaw, Michigan, of over $18,000. Two of the robbers jumped over the four-foot-high counter, one of them striking an elderly customer in the face while doing so. The tellers

---

[*] The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

were forced to lie on the floor at gunpoint while the robbers emptied two of the three teller drawers. Two shotgun blasts were fired. The first shot was apparently fired as a warning shot to the credit union manager, and it nearly hit him. The second shot was fired across the lobby as the robbers departed. The four men departed in a stolen red Firebird, which they abandoned shortly thereafter.

Bond, Walker, and Brown were convicted of both counts alleged in the indictment. A fourth defendant, Charles Vaughn, was acquitted.

## · II.

### Challenges to Convictions

#### A.

#### Severance

■ Defendant Walker argues that the district court erred in denying his mid-trial motion for severance. The motion was generated by codefendant Bond's cross-examination of government witness Robert Bryant Wilbert. Wilbert testified on direct that he was aware of the credit union robbery and that he had seen Walker and Bond at the Fashion Square Mall in Saginaw on Saturday, December 1, 1990, the day after the robbery. Wilbert stated that Bond spent "a couple [of] hundred" dollars from a large bundle of cash in a sporting goods store. Wilbert also observed Walker with a shopping bag, but did not see him make any purchases. On cross-examination, Bond's attorney, Arthur Fitzgerald, questioned Wilbert about an interview he gave to an FBI agent on September 18, 1991. Fitzgerald suggested that Wilbert had told the FBI agent that he had seen Walker, rather than Bond at the mall with over a thousand dollars. Fitzgerald also intimated that the witness had stated that he saw Walker at the mall on November 3, 1990, prior to the robbery. On the basis of this colloquy, Walker's counsel requested a severance, stating that "[i]t appears [that] I have two prosecutors here. I am dealing with antagonistic defenses with Mr. Fitzgerald." Walker maintains that Fitzgerald attempted to get Wilbert to

agree that he had seen Walker, not Bond, with large sums of money and that he had seen these individuals on November 3, 1990, not December 1, 1990.

■ Severance will be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). Antagonistic defenses alone are not enough; the defendant must show that the antagonistic defenses are likely to mislead or confuse the jury. *United States v. Weiner*, 988 F.2d 629, 634 (6th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 142, 126 L.Ed.2d 105 (1993).

■ Our review of this issue is limited to plain error, as Walker failed to renew his motion for severance at the close of all the evidence, thereby waiving it. *See United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992); *United States v. Swift*, 809 F.2d 320, 323 (6th Cir.1987). We find none. As the district court concluded, the most that can be said of Wilbert's testimony is that there was some confusion about the date on which the incident in the mall occurred. The record reveals that, despite any apparent attempt by Fitzgerald to shift the blame to Walker from his client, Wilbert maintained that it was Bond who had the cash and that he told the FBI agent that he had seen Walker and Bond "the following day, that Saturday." The district court committed no error.

#### B.

#### Sufficiency of Evidence

■ Defendants Bond and Brown argued below and on appeal that the evidence is insufficient to support their convictions. We review the record to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560

(1979); *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989) (quoting *Jackson* ). Circumstantial evidence alone is adequate to uphold a conviction, and such evidence "need not remove every reasonable hypothesis except that of guilt." *Ellzey,* 874 F.2d at 328 (quotation omitted). This court will reverse a judgment on insufficiency grounds only if the judgment is not supported by substantial evidence upon the record as a whole. *Id.* (quotation omitted). The credibility of witnesses is exclusively the province of the jury. *United States v. Schultz,* 855 F.2d 1217, 1221 (6th Cir.1988).

■ Bond asserts that there is no evidence or incriminating statements other than an inconclusive remark by Bond to Walker and Vaughn overheard by an FBI agent that "I didn't see anyone following us." Brown contends that he does not match the height and weight description of the robbers and that the eyewitness's testimony identifying him is not credible because of the ski mask. Although the evidence presented was largely circumstantial (defendants' disguises apparently were quite effective), the following supports their convictions: (1) the getaway car was identified by an individual who followed the vehicle and who wrote down the license plate; (2) the car had been stolen from a gas station in Pontiac, Michigan, several weeks earlier and had defendant Bond's fingerprints both inside and outside on the driver's side; (3) a friend of Bond's testified that he had seen Bond driving a red Firebird for two to three weeks prior to the robbery; (4) a music tape reported missing by the owner of the car was later found in defendant Walker's house; (5) ammunition for three different handguns, a spent shotgun shell, and stacks of cash sorted by denomination were found in Walker's house on January 11, 1991; (6) Alvin Pratt, a friend of defendants, testified that all three defendants had confided in him about the robbery, and that Brown specifically stated that he had vaulted the counter and grabbed the money from the tellers; (7) Robert Lucas, an FBI agent, testified that he overheard Bond, Walker, and Vaughn in the marshal's lockup in the courthouse talking about killing Wilbert because he was going to testify against them. We think this ample circumstantial evidence upon which to sustain a conviction.

Brown makes much of the fact that some of the witnesses testified that all four robbers were between 5'7" and 5'10" when he in fact is 6'4" and 220 pounds. However, at least one witness, Theodore Alvarez, who had watched the robbery occur from the parking lot and who followed defendants, testified that one of the defendants stood taller than the others and "must have been at least six foot or taller." As to the eyewitness testimony of Alma Buck, one of the bank tellers, she stated that (although in the fetal position underneath her desk) she had eye contact with one of the suspects (whom she identified at trial as defendant Brown), and that "when you're dealing with the public you do tend to have a lot of eye contact with members, and I do remember eyes." The jury obviously was free to disbelieve her if they found her testimony not credible. Further, Pratt's testimony confirmed that Brown himself had admitted jumping over the bank counter. In any event, there is sufficient evidence in the record to support defendants' convictions independent of Buck's testimony.

### C.

### Prosecutorial Misconduct

■ Defendants Brown and Bond both argue that various statements by the prosecutor during closing argument deprived them of a fair trial. We deal with each specific contention in turn, mindful of the fact that prosecutorial misconduct cannot support a grant of a new trial unless it is "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *United States v. Payne,* 2 F.3d 706, 712 (6th Cir. 1993) (per curiam) (internal quotations omitted; alteration made by *Payne* court). The Supreme Court has instructed that a prosecutor's comments must be viewed in context, and that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); *Payne,* 2 F.3d at 712 (quoting *Young* ). Proper context includes defense

counsel's conduct as well as the nature of the prosecutor's response, i.e., the "invited response." *Young*, 470 U.S. at 11, 105 S.Ct. at 1044; *Payne*, 2 F.3d at 712.

#### 1.

■ Defendant Brown's first objection concerns a statement made by the prosecutor in closing regarding Alma Buck's surprise (to both prosecution and defense) in-court identification of defendant Brown as one of the robbers. Defense counsel then attempted to impeach that testimony by getting Buck to admit that she had not made any identification when the robbery occurred and that Brown's physical traits did not match her description that the robber was 5′9″ tall and weighed about 145 pounds. In arguing during closing that the jury should credit Buck's identification, the prosecutor reminded the jury that Brown and Walker were members of the credit union, and that Buck had seen Brown in the credit union three or four days after the robbery. The prosecutor then argued that "[p]ointing him out from among the four defendants at the table is, in some ways, remarkably similar to a lineup situation." Brown maintains that in making this statement, the prosecutor referred to facts outside the record and that he engaged in improper "vouching."

This argument is without merit. First, if read in context, the statement in no way suggests that a pretrial lineup had occurred. Second, the prosecutor's statement, on its face, does not express a personal belief in Buck's credibility. *Cf. United States v. Hurst*, 951 F.2d 1490, 1502 (6th Cir.1991) (prosecutor did not vouch for witness's credibility when, in response to defendant's attacks on the credibility of the government's main witness, the prosecutor explained his efforts to guarantee full and truthful disclosure by the witness), *cert. denied*, — U.S. —, 112 S.Ct. 1952, 118 L.Ed.2d 556 (1992).

#### 2.

■ Brown asserts that the prosecutor improperly suggested to the jury that they consider the indictment as evidence of guilt; and exacerbated the situation by telling the jury statements of Brown's defense counsel were "illegal, improper, unethical." The prosecutor's remarks concerning the grand jury were directed at defense counsel's opening statement that Alvin Pratt would lie at trial to implicate Brown and protect himself. The prosecutor stated:

> It's a scary notion, you were told, that someone like Pratt can cause an armed robbery charge to be brought.

> Well, members of the jury, we know from the evidence that was presented in this case that Mr. Pratt didn't cause an armed robbery charge to be brought, we know from the evidence that's been produced in this case that an indictment was returned after witnesses were brought before a grand jury consisting of 23 individuals investigating and who then returned an indictment in this case.

Defendant Brown claims that these comments "invited" his retorts that the government had failed to present many of the witnesses who had appeared before the grand jury.

We do not read the prosecutor's statement as suggesting that the grand jury heard evidence not presented to the trial court or that the indictment is evidence of guilt. In any event, the court instructed the jury that "[t]he indictment is not evidence of guilt of any kind, it is just the formal way that the government tells the defendant what crime he is accused of committing." *See Payne*, 2 F.3d at 712 (curative instruction designed to overcome or dissipate any prejudice that may have been caused by prosecutorial misconduct may render error harmless).

Nor did the prosecutor intimate that defense counsel's comments were unethical. What the prosecutor said was that "with the exception of several areas where I objected during the closing arguments of Mr. Dunn, [ ] the arguments that have been presented here haven't—by my opponents—have not been illegal, improper, unethical, or anything of that nature, but there has been one law that's been violated in a sense, it's the law of reason and common sense." When viewed in full, the prosecutor's statement simply does not support defendant's gloss on it.

**3.**

■ Next, defendant Brown complains of the prosecutor's remarks that none of the witnesses offered by defendants stated that they were with any of the four the day of the robbery or that they saw them or otherwise knew that they were not at the credit union on November 30, 1990. The comments at issue are:

It isn't very helpful, members of the jury, when the sole issue in the case is who did it, and are these four the ones who committed the robbery, to have somebody come in and say that they didn't think that Agent Lucas was very courteous or respectful six weeks after the robbery took place when he was looking for Larry Walker.

Putting family members on to say such things, or that there was a certain amount of financial support, fifty or seventy-five dollars a week that was being paid by, I think, the mothers of two of the defendants to them during roughly that period of time doesn't help us very much. None of the defense went to what's really important in the case.

No one said that they were with any of these four that day or that they saw them or that these four were not at the Wanigas Federal Credit Union on November 30, 1990.

■ It is axiomatic that a defendant in a criminal trial need not testify or produce any evidence, and that a prosecutor may not comment on the absence of such. *United States v. Drake,* 885 F.2d 323, 323 (6th Cir. 1989), *cert. denied,* 493 U.S. 1033, 110 S.Ct. 750, 107 L.Ed.2d 767 (1990). The prosecutor may, however, summarize the evidence and comment on its quantitative and qualitative significance. *Id.* at 324. In evaluating a claim of improper comment by a prosecutor, the court should consider whether the comments were "manifestly intended" to reflect on the accused's silence or are of such a character that the jury would "naturally and necessarily" construe them as such; the comments were isolated or extensive; there was

otherwise overwhelming evidence of guilt; and appropriate curative instructions were given. *Id.*

The prosecutor's comments do not require reversal. Nothing in the record shows that the comments were "manifestly intended" to reflect on the defendants' silence; the comment was an isolated one and the evidence of guilt was otherwise abundant. In addition, the prosecutor himself during closing commented on the fact the defense is under no obligation to testify or offer evidence. Rather, we think the remarks best characterized as an attempt to summarize the evidence and comment on its probative value, with minimal prejudice to defendant. *Id.* at 324; *United States v. Beddow,* 957 F.2d 1330, 1336 (6th Cir.1992) (prosecutor's comment about failure of defendant's brother to testify in support of defendant's claim that brother loaned him the money did not constitute per se reversible error where they were invited by defense counsel's remarks that defendant's income could be explained by loan; remark was minimal in impact compared to other evidence of guilt and focused on the quality of defendant's evidence compared to government's evidence). In sum, we find no error.

**4.**

■ In closing argument, Brown's counsel described the reasonable doubt standard as "the kind of doubt—it's the kind of decision you would make, that you would rely on and act on without hesitation in making the most important decision in your life. That's the test for reasonable doubt." [1] In rebuttal, the prosecutor countered:

If the standard was ... would you hesitate at any time when making an important decision in your own personal life, who hasn't hesitated before you bought a house, before you decided to marry somebody, before you decided to divorce somebody, before you bought an automobile, before you cross a street sometime you hesitate.

---

**1.** This court recently affirmed the constitutionality of the "hesitate-to-act" standard, which is embodied in this circuit's pattern jury instruction on reasonable doubt, Sixth Circuit pattern criminal jury instruction 1.03. *See United States v. Goodlett,* 3 F.3d 976, 979 (6th Cir.1993).

If that was, indeed, the standard, ladies and gentlemen, then no jury in this country would ever convict anybody. And that is the standard the defense attorneys would have you follow in this particular case.

Whatever the impropriety, the court, immediately upon Brown's counsel's objection, cautioned the jury that "[t]he judge will give the law in this case, counsel may argue from the principles of law." In addition, at the outset of the charge the court reminded the jury that "if anything that an attorney said about the law is different from what I tell you, you will ignore what the attorneys said and you will follow what the judge said. What I say about the law controls." In light of the district court's repeated admonitions, we find that any potential prejudice to the defendant was cured.

### 5.

■ Brown and Bond complain that the prosecutor improperly suggested in closing that the jury must convict or acquit all four defendants by his reference to a defense theory that "we have got the wrong four men on trial, this is a huge mistake that's been made." When read in context however, it is clear that the government was merely describing its perception of the defenses' theory of the case. Additionally, the district court instructed the jury to consider the evidence against each defendant separately at both the beginning and close of the charge to the jury. In fact, Bond received a special instruction that he was only an accessory after the fact. The jury obviously understood the court's instructions, because it acquitted one of the defendants, Charles Vaughn. This claim too is without merit.

### III.

### Sentencing Issues

Applying the offense conduct guideline applicable to violations of 18 U.S.C. § 2113(d),[2] United States Sentencing Commission, *Guidelines Manual,* § 2B3.1 (Nov. 1991), the district court calculated the total adjusted offense level for Bond and Brown as follows. Beginning with a base offense level of 20, the court added 2 points because a financial institution was involved, § 2B3.1(b)(1); 5 points for the discharge of a firearm, § 2B3.1(b)(2)(A);[3] 2 points for bodily injury, § 2B3.1(b)(3); and 1 point because the amount involved was greater than $10,000, § 2B3.1(b)(6)(B). Bond and Brown thus received a total adjusted offense level of 30. Walker was given an additional two points for being an organizer, pursuant to § 3B1.1(c), resulting in a total adjusted offense level of 32.

The district court assigned to defendant Bond a criminal history category of IV, departing upward from the presentence report's recommendation of category II.[4] Bond's guideline range was therefore 135–168 months. Defendant Brown was placed in criminal history category I, which resulted in an applicable guideline range of 97–121 months. Walker's criminal history score was computed as level IV. This yielded a guideline range of 168–210 months.

---

2. The guideline for 18 U.S.C. § 371 is U.S.S.G. § 2X1.1, which directs the court to apply the base offense level from the guideline for the substantive offense. § 2X1.1(a). The conspiracy and substantive counts were grouped according to § 3D1.2(b).

3. The robbery guideline was amended effective November 1, 1991, increasing the adjustment for discharge of a firearm from 5 levels to 7 levels. *See* U.S.S.G. § 2B3.1(b)(2)(A) (Nov. 1991). The district court applied correctly the lower level found in the November 1990 Guidelines Manual thereby avoiding an apparent ex post facto problem. *See United States v. Holmes,* 975 F.2d 275 (6th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1322, 122 L.Ed.2d 708 (1993).

4. There is some confusion in the record concerning defendant Bond's criminal history score, generated perhaps by the fact that there are two presentence reports on Bond. The original report advised a criminal history score of II, the revised version set it at III. At the sentencing hearing and in the judgment and commitment order the court assumed that the presentence report's "tentative determination" was a criminal history category of II. However, the document reflecting the court's revised tentative determination explicitly accepted the probation officer's recommendation of category III. Because the court's final and binding word on the subject, the judgment and commitment order, reflects a criminal history score of II, it is this figure we consider on appeal.

The district court made upward departures in all three cases pursuant to § 5K2.3 (extreme psychological injury) and § 5K2.6 (weapons and dangerous instrumentalities). The court sentenced both Brown and Bond to 276 months on the robbery count, to be served concurrently with the 60 months received on the first count. Walker received concurrent sentences of 300 months on the robbery count and 60 months on the conspiracy count.

Defendants raise various challenges to these rulings.

## A.

### Extreme Psychological Injury

▇▇▇▇ All three defendants challenge the district court's decision to depart upward pursuant to § 5K2.3 (extreme psychological injury). An upward departure is permissible if the court finds aggravating circumstances not adequately taken into account by the Sentencing Commission, or if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0; *United States v. Lassiter*, 929 F.2d 267, 270 (6th Cir.1991). This court employs a three-step analysis in reviewing guideline departures. First is the legal question of whether the circumstances identified by the district court are of a kind or degree that is sufficiently unusual to warrant a departure. Second, is the fact-based inquiry of whether the unique circumstances actually exist in the particular case, which is reviewed for clear error. Third, is a measure of the extent of the departure against a standard of reasonableness. *United States v. Joan*, 883 F.2d 491, 494 (6th Cir.1989).

▇▇▇ The Guidelines state that "extreme psychological injury" may justify an upward departure "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense...." U.S.S.G. § 5K2.3, p.s. The policy statement thereafter amplifies what is meant:

> Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

The offense conduct guideline for armed robbery is silent as to extreme psychological injury to victims (addressing only bodily injury); an upward departure may therefore be appropriate if circumstances so warrant. *United States v. Lucas*, 889 F.2d 697, 701 (6th Cir.1989); *United States v. Nomeland*, 7 F.3d 744, 748 (8th Cir.1993) (following *Lucas*).

Here the court stated that it was departing pursuant to § 5K2.3 because the case involved "the most violent and wanton display of savage force recounted in this courtroom in years," the traumatic effects of which would impact "on several of the many victims ... for their entire life times." The court noted that "one victim very narrowly missed being eviscerated by the discharge of a shotgun blast from a few feet away," that "[o]thers were made to kneel and cower, not knowing if or when a gunshot from behind would end their lives," and that "one of the bank tellers behind the counter was threatened by having a pistol placed against her head." It therefore departed because it felt that the guidelines did not account properly for the extreme degree of brutality displayed by the defendants or the mental anguish suffered by the victims.

In *Lucas*, we affirmed the district court's upward departure where the defendant forced bank tellers to endure the humiliation of being forced to strip at gunpoint, and where one of the tellers testified that she had changed jobs and was still undergoing counseling. 889 F.2d at 699. The district court here identified factors somewhat similar to those in *Lucas*, most significantly the impact on several of the victims for the rest of their lives, which if true, might warrant an upward departure within the parameters of § 5K2.3.

Thus, the first *Joan* factor was satisfied to the extent the court identified long-term effects on victims.

We next turn to the second *Joan* factor, whether the special factors identified by the district court are actually present. The court purportedly based its conclusions on testimony taken at the victim-impact hearing. The first witness, Sheryl Stanley, the branch manager of the credit union, testified as to her observations of three employees present during the robbery. Stanley stated that two of the employees, Lynda Wynes and Marion Kushner, both expressed fear and anxiety and had to be transferred to another branch for approximately two weeks after the incident. As for Alma Buck, who had had a gun held to her head, Stanley testified that Buck became very nervous after testifying at the trial (which occurred approximately one and a half years after the bank robbery) and that she took a six-week disability leave as a result. Special Agent Robert Lucas also testified concerning Ms. Buck. He stated that when he visited the credit union after the robbery, Buck broke down, cried, and expressed fear for her life. None of the victims testified at the victim-impact hearing, nor was any medical testimony presented.

Simply put, this evidence does not establish § 5K2.3's requirements that the psychological injury be a "substantial impairment" of the psychological functioning of the individual, that is of "extended or continuous duration," and that has manifested itself by "physical or psychological symptoms." *Cf. Lucas*, 889 F.2d at 699 (victim testified that she had changed jobs and was still undergoing counseling). The most that can be said is that the tellers suffered anxiety for several weeks after the robbery; but this would not be unusual for any victim of an armed bank robbery. *See Nomeland*, 7 F.3d at 748 (fact that victim bank teller experienced headaches and loss of sleep and met with a chiropractor on two occasions, standing alone, would not justify departure under 5K2.3); *see also United States v. Mandel*, 991 F.2d 55, 58–9 (2d Cir.1993) (record did not support finding of severe psychological injury in mail fraud where first victim testified that she had suffered nervous breakdown but never directly stated that defendant's conduct was major factor in breakdown, and second victim stated that she had been shocked, had lost her job, and had seen therapist); *United States v. Lara*, 975 F.2d 1120, 1128 (5th Cir.1992) (departure under § 5K2.3 not warranted; purported victim was placed on tranquilizers due to possible nervous breakdown, but there was no evidence of substantial impairment or its duration); *United States v. Fawbush*, 946 F.2d 584, 586–87 (8th Cir.1991) (upward departure in child sexual abuse case unwarranted where victim's therapy and probation officer's opinion did not demonstrate that psychological injury exceeded that normally endured by sexual abuse victims). The fact that Ms. Buck took an extended disability leave is not probative here, because the leave was in response to having testified at trial, not as a result of the robbery. In sum, we conclude that the second *Joan* factor was not satisfied. Thus, because the unique circumstances identified do not actually exist, the district court committed clear error requiring us to remand for recalculation of defendants' sentences without this departure.

## B.

### Weapons and Dangerous Instrumentalities

■ Defendants argue that the departure under § 5K2.6 was unwarranted because a five-level increase had already been added to the base offense level. Section 5K2.6 provides that a court may increase a sentence above the authorized guideline range if a weapon or dangerous instrumentality was used, possessed, or discharged during the crime. *See* U.S.S.G. § 5K2.6, p.s. However, because the offense conduct guideline at issue, § 2B3.1, expressly takes account of the discharge of a firearm, *see* § 2B3.1(b)(2)(A), a departure is not justified unless "the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." Section 5K2.0.

Here the district court found that the circumstances of the discharge—narrowly missing the bank manager with a shotgun blast—and the fact that there were two separate shotgun blasts—one at the beginning and one at the end of this robbery—were aggra-

vating factors not adequately considered by the guideline itself. The court stated that the crime score accounting for the discharge of a firearm "did not adequately account for the extraordinary danger and terrorizing effect of a blast from a sawed-off shotgun, aimed in the direction of and very nearly killing a business manager, and perpetrated in a sedate but crowded business environment."

We disagree. The unfortunate reality is that robbers discharge firearms during robberies specifically to frighten the victims, to ensure cooperation with their demands, and to facilitate escape; the factors articulated by the district court do not deviate substantially from that norm. Thus, the district court's holding fails under the first *Joan* factor, and also constitutes impermissible double counting. *See United States v. Hicks*, 4 F.3d 1358, 1363 (6th Cir.1993) (directing district court to consider on remand whether heinousness of crime—shooting person in the head—had already been taken into account under assault guideline and would therefore constitute double counting); *United States v. Romano*, 970 F.2d 164, 167 (6th Cir.1992) (certain conduct is used to enhance defendant's conduct under one enhancement provision, defendant would not be penalized for same conduct again under a separate provision).

### C.

### Adequacy of Criminal History Category

▮ Defendant Bond claims that the district court abused its discretion when it increased his criminal history score. The presentence report recommended a criminal history score of II,[5] but the district court felt that a category IV more accurately reflected Bond's "true background."

Although § 4A1.3 authorizes the district court to make an upward departure when the criminal history category "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes," U.S.S.G. § 4A1.3, p.s., this court also imposes the requirement that the district court proceed by formally considering the next crimi-

nal history category. *See Lassiter*, 929 F.2d at 271; *United States v. Kennedy*, 893 F.2d 825, 829 (6th Cir.1990). The district court did not do that here, and we therefore remand for further proceedings. In addition, the district court is directed to make specific rulings on Bond's challenges to the 4 points calculated by the probation officer on the basis of two prior convictions for carrying concealed weapons and a probation violation.

### D.

### Prior Sentences in Related Cases

▮ In January of 1991, a shotgun shell and ammunition for several handguns were seized from Walker's residence, and the ammunition was introduced at trial in the instant offense. Walker was separately indicted for illegal possession of ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g) based on the January 1991 seizure; and convicted of that offense on August 26, 1991. Walker challenges the inclusion of a conviction for illegal possession of ammunition in his criminal history score, maintaining that the § 922(g) conviction is not a "prior sentence" for purposes of U.S.S.G. § 4A1.2 because the offense was part of the instant crime.

▮ "Prior sentence" is defined in § 4A1.2 as "any sentence previously imposed upon adjudication of guilt.... for conduct not part of the instant offense." A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is considered a prior sentence if it was for conduct other than conduct that was part of the instant offense. U.S.S.G. § 4A1.2(a)(4), comment. (n. 1). As we held in *Beddow*, the proper inquiry is whether the "prior sentence" and the present offense involve conduct that is severable into two distinct offenses. *Beddow*, 957 F.2d at 1338. *United States v. Escobar*, 992 F.2d 87, 89 (6th Cir. 1993) (following *Beddow*). The inquiry is necessarily fact-specific, and involves more than just consideration of the elements of the two offenses. *Id.* Factors such as common

---

**5.** *See supra,* note 4.

plan or intent, and temporal and geographical proximity must be considered. The district court's factual findings are reviewed under the clearly erroneous standard. *Id.*

With sufficient fact findings,[6] the ruling is absolutely consistent with *Beddow. See Hicks,* 4 F.3d at 1362–63 (state court conviction for cocaine possession was prior sentence even though cocaine was found when defendant was arrested for assault underlying federal weapons offense; where there was no evidence that defendant used a gun in relation to his drug trafficking activities); *Escobar,* 992 F.2d at 89–90 (cocaine possession conviction was not part of federal offense and could therefore be treated as "prior sentence" though conduct occurred during the period of time of the continuing criminal enterprise and cocaine trafficking conspiracy to which defendant pleaded guilty); *Beddow,* 957 F.2d at 1338 (district court's factual finding that state concealed weapon conviction was not part of federal money laundering offenses even though defendant carried concealed weapon to protect emeralds he purchased as part of money laundering scheme justified including state crime in criminal history category). As in those cases, the possession of ammunition was not charged in the instant indictment or superseding indictment, and did not have to be proven as an element of any of the offenses charged. *Escobar,* 992 F.2d at 89–90. Thus, given the uncertain state of the record on this issue on appeal (which we attribute wholly to the parties) we ask that the district court revisit the issue on remand.

## IV.

### Conclusion

Defendants' convictions are **AFFIRMED**; defendants' sentences are **VACATED** and **REMANDED** for resentencing in accordance with this opinion.

---

6. We were unable to find specific fact findings by the district court on this point, although they are alluded to by both counsel and the court.