110 F.3d 65
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eric SMITH, Defendant-Appellant.
 No. 95-5674.
 United States Court of Appeals, Sixth Circuit.
 April 8, 1997.
 
 Before: KEITH, NELSON, and MOORE, Circuit Judges.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is a drug case in which the defendant, found guilty on both counts of a two-count indictment, appeals from the judgment in which he was convicted and sentenced. We shall affirm the convictions, finding them supported by sufficient evidence and untainted by prosecutorial misconduct. The case will be remanded for resentencing on one of the offenses, however, because of an Ex Post Facto Clause problem arising from the district court's use of the wrong edition of the United States Sentencing Commission's Guidelines Manual.
 
 
 2
 * In December of 1993 an indictment was handed up against the defendant, Eric Smith, and a co-defendant named Anthony Strawder. Count 1 of the indictment charged the men with conspiracy to distribute cocaine base (crack cocaine) and conspiracy to possess the substance with intent to distribute it. Count 2 charged them with establishing and maintaining a crack house at 1467 Menager, a street in Memphis, Tennessee. Both counts related to a nine-and-a-half-week period in the summer of 1992.
 
 
 3
 Mr. Strawder ultimately pleaded guilty. The case against Mr. Smith went to trial before a jury, with Mr. Strawder testifying for the prosecution pursuant to a plea bargain.
 
 
 4
 The evidence presented by the government at trial showed, among other things, that police had raided the house at 1467 Menager on four separate occasions during the period in question. The first raid, conducted on June 17, 1992, resulted in the discovery and seizure of pipes used for smoking crack cocaine. A man named Wade Malone, who ultimately became a witness for the government, was arrested and charged with possession of drug paraphernalia. Defendant Smith was in the house at the time, but he was not arrested.
 
 
 5
 The second raid, conducted on August 1, 1992, turned up 1.9 grams of crack cocaine, a pill bottle in the toilet, two CB radios, two intercoms, a pair of binoculars, and a crack pipe. Discovered outside the house, on a brick ledge below the bathroom window, were 21.39 grams of crack cocaine wrapped in plastic. Wade Malone, Anthony Strawder, and a juvenile were arrested in this raid.
 
 
 6
 The police returned to the Menager house again on August 4, 1992. In the three days since the previous raid a metal storm door with dark reflective glass had been installed at the front entrance. (There was evidence that the purpose of the door was to give occupants of the house more time to flush drugs down the toilet in the event of a raid.) A search of the house turned up 4.97 grams of crack cocaine, a .22 caliber automatic pistol, and seven rounds of ammunition. Defendant Smith, who was again present, proved to be carrying $627 and a pager.
 
 
 7
 Immediately following the August 4 raid, according to the government's evidence, Mr. Smith admitted to the police that there was drug dealing at the house and that "he was running the house...." A man named Tony Henderson testified at trial that he owned the pistol found during the August 4 raid and that he had been hired to serve as a bodyguard for Anthony Strawder and to "watch[ ] the door" at the house.
 
 
 8
 In the final raid, conducted on August 18, 1992, some .32 grams of crack, .62 grams of marijuana, a loaded .38 caliber pistol, and a loaded .45 caliber pistol were found inside the house. The police also found 9.69 grams of crack outside the house near an open window. Mr. Smith was not present, but eight other people, three of whom were juveniles, were taken into custody.
 
 
 9
 On August 23, 1992, police officers saw Mr. Smith arrive at the Menager house driving a white van. He took a package from the van and placed it underneath the house. The officers arrested Mr. Smith and retrieved the package, which was found to contain 14.30 grams of crack.
 
 
 10
 Mr. Strawder testified at trial that he and Mr. Smith were business partners who would split the cost of buying crack for resale; that he and Mr. Smith both sold crack from the Menager house during the relevant time period; and that Mr. Smith paid the bills for the house, including the rent, and had arranged for installation of the metal door with tinted glass. Mr. Strawder futher testified that Mr. Smith visited the house on a daily basis and sometimes spent the night there.
 
 
 11
 Mr. Malone, a crack addict, testified that he spent $150 to $200 per week on drugs at the Menager house. He also testified that in exchange for crack he cleaned Mr. Smith's clothes at the dry cleaning plant where he was employed.
 
 
 12
 Among other witnesses who testified against Mr. Smith was Robert Lloyd Turner, one the eight people arrested during the August 18 raid. He said that he thought the Menager house was Mr. Smith's. He also testified that he overheard Mr. Smith discuss plans to sell drugs to a juvenile.
 
 
 13
 Mr. Smith's father, called as a witness by the government, testified that he (the father) owned the Menager house during the relevant period, but that the house was rented to a Tim Longmeyer. The elder Mr. Smith admitted that he had never seen Longmeyer at the house, and he acknowledged that in June, July, and August of 1992 it was defendant Smith who brought him the rent money. Defendant Smith was described as the caretaker of the property.
 
 
 14
 At the conclusion of the trial the jury found defendant Smith guilty on both counts of the indictment. Using an edition of the Guidelines Manual that incorporated changes which became effective on November 1, 1992, the court imposed consecutive prison sentences of 10 years on the first count and 20 years on the second. This appeal followed.
 
 II
 
 15
 Mr. Smith argues on appeal that the government's evidence was not sufficient to sustain the convictions. We disagree. The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Ferguson, 23 F.3d 135, 140 (6th Cir.1994) (citations omitted). From the evidence outlined above, it seems clear to us that a rational juror could easily have found beyond a reasonable doubt that Mr. Smith was guilty as charged.
 
 III
 
 16
 The Guidelines Manual prescribes a two-level increase in a drug defendant's base offense level if a firearm or other dangerous weapon was possessed. U.S.S.G. § 2D1.1(b)(1). The district court did not err in applying § 2D1.1(b)(1) here.
 
 
 17
 This court has consistently held that the two-level enhancement "is proper where it was foreseeable to a defendant that his coconspirator would possess a gun in connection with their drug trafficking." See United States v. Perkins, 994 F.2d 1184, 1192 (6th Cir.), cert. denied, 510 U.S. 903 (1993) (citations omitted).
 
 
 18
 In the instant case Mr. Strawder's "bodyguard," Tony Henderson, was Mr. Smith's unindicted coconspirator. Mr. Henderson admitted to owning the gun discovered in the August 4 raid, and he admitted that he "watch[ed] the door" of the Menager house. Two other firearms were found in the August 18 raid. There was ample evidence that the establishment was run by Mr. Smith. We cannot say that the district court erred in finding that Mr. Smith could and should have foreseen that firearms would be used to protect the crack house he was operating.
 
 IV
 
 19
 Mr. Smith argues that there was not sufficient proof to establish the quantity of drugs used by the district court in determining the sentence. Again we disagree.
 
 
 20
 Application Note 12 to U.S.S.G. § 2D1.1 states in relevant part that when "the amount [of a controlled substance] seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." The sentencing court must err on the side of caution when making the approximation called for by Application Note 12. United States v. Ward, 68 F.3d 146, 149 (6th Cir.1995) (citations omitted), cert. denied, 116 S.Ct. 1028 (1996). Approximations are not clearly erroneous, however, when they are "supported by competent evidence in the record." Id.
 
 
 21
 In the instant case the district court approximated the amount of crack for which Mr. Smith was responsible by using Mr. Strawder's testimony to the effect that nine ounces of crack per week were being sold through the Menager house. The conspiracy having lasted for over nine weeks, the court concluded that Mr. Smith was responsible for a total of 81 ounces.
 
 
 22
 Mr. Strawder's testimony carried at least a "minimum indicium of reliability beyond mere allegation." Ward, 68 F.3d at 149 (internal quotation marks omitted). The trial evidence established that Mr. Strawder was deeply involved in the activities at the Menager house. He testified at the sentencing hearing that he was present enough of the time to see the amount of crack being moved through the place. Given that Mr. Strawder himself was selling at least an ounce of crack there each week, this does not seem implausible.
 
 V
 
 23
 Mr. Smith complains on appeal that during final argument the prosecutor commented twice on the defendant's failure to testify. First, in addressing the issue of whether the Menager house was in fact a crack house, the prosecutor said this:
 
 
 24
 "I submit to you that it was unrebutted that it was a crack house. I don't think there was any witness that came here and said no, this was not a crack house, that there was no crack inside that location."
 
 
 25
 Later in her closing the prosecutor made the following observation:
 
 
 26
 "Then William McAdams [sic], he puts Eric Smith there [at the Menager house]. He said his brother sold crack out of the house. So that gives us another idea that this was obviously a crack house to everyone but according to Mr. Smith's witness, Mr. Smith himself."
 
 
 27
 It is far from clear to us that these statements were improper. A prosecutor is entitled to summarize the evidence and comment on its quantitative and qualitive significance. United States v. Bond, 22 F.3d 662, 669 (6th Cir.1994). Here, as in Bond, it is difficult to say that the isolated comments in question were "manifestly intended" to reflect on the defendant's silence. Id. Because there was no objection at the time of trial, in any event, we may not reverse Mr. Smith's convictions on this ground unless "the error is so plain that the trial judge and the prosecutor were derelict in countenancing it." United States v. Carroll, 26 F.3d 1380, 1383 (6th Cir.1994) (internal quotation marks and citations omitted). The error, if any, was far from "plain" under this standard.
 
 VI
 
 28
 Mr. Smith also contends that the prosecutor improperly vouched for the credibility of a witness. This contention is based on the following passage in the prosecutor's closing argument:
 
 
 29
 "And I want you to also use your common sense and draw on your life experiences, someone else had already been arrested, Wade Malone had already been arrested, Mr. Strawder had already been set free. Why but for the fact would he come to the grand jury and admit his involvement, not only his involvement but the involvement of the other individuals that were there [?] I submit to you ladies and gentlemen because he--he told the truth and he is worthy of belief."
 
 
 30
 Prosecutors should not vouch for the credibility of their witnesses, United States v. Hurst, 951 F.2d 1490, 1502 (6th Cir.1991), cert. denied, 504 U.S. 915 (1992), and this court engages in a two-part analysis where such vouching is claimed to have occurred. Carroll, 26 F.3d at 1385. "[F]irst we determine whether a prosecutor's remarks were improper, and then we determine whether the impropriety amounts to reversible error." Id. In regard to the second inquiry, the Carroll court noted that a non-persistent expression of a prosecutor's personal beliefs constitutes reversible error when "proof of guilt is not overwhelming, the defense counsel objected to the comments, and the trial judge failed to give a curative admonishment to the jury." Id. at 1386.
 
 
 31
 We think it doubtful that the first part of the Carroll test was met here. "I submit" is a time honored method of saying to the jury, "I ask you to find." The locution is not normally treated as meaning "I believe" or "in my opinion."
 
 
 32
 In any event, the second part of the Carroll test was clearly not met in the instant case. The remark in question was a single, isolated event; the evidence against Mr. Smith was very strong; and Mr. Smith's trial counsel offered no objection to the remark and requested no curative instruction. We see no basis for reversal.
 
 VII
 
 33
 Finally, Mr. Smith contends that the district court violated the Ex Post Facto Clause of the Constitution by sentencing him on Count 2 under an edition of the Guidelines Manual that became effective only after completion of the crime and that called for a harsher sentence than the edition in effect when the crime was committed. The pertinent facts may be summarized thus:
 
 
 34
 --It is undisputed that Mr. Smith's operation of the crack house ended in August of 1992.
 
 
 35
 --Under the guidelines in effect at that time, the base offense level for maintenance of a drug establishment was set at 16. See U.S.S.G. § 2D1.8 (1991). In Mr. Smith's case the use of this offense level, assuming appropriate adjustments, would have resulted in a guideline range of 57-71 months, as we understand it.
 
 
 36
 --Effective November 1, 1992, the guidelines were changed to make the base offense level identical to that applicable under § 2D1.1 for the underlying drug offense. See U.S.S.G. § 2D1.8 (1992). The base offense level applicable under § 2D1.1 in Mr. Smith's case was 38.
 
 
 37
 --Using the guidelines in effect at the time of sentencing, the district court sentenced Mr. Smith to imprisonment for 240 months--a sentence that appears to have been 169 months longer than the maximum sentence that could have been imposed under the earlier edition without exceeding the guideline range.
 
 
 38
 "Where revision of the Guidelines changes the legal consequences of acts completed before its effective date' to a convict's detriment, the Ex Post Facto Clause requires application of the Guidelines in effect at the time of the criminal act." Nagi v. United States, 90 F.3d 130, 134 (6th Cir.1996)--hereinafter "Nagi II"--(quoting United States v. Kassmaul, 987 F.2d 345, 351-52 (6th Cir.1993)). Mr. Smith did not object to the district court's failure to use the 1991 edition of the Guidelines Manual, however, and it follows that the error may not be rectified unless it was plain. United States v. Thomas, 24 F.3d 829, 832 (6th Cir.1994). An error is plain when it "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993) (internal quotation marks and citations omitted). Cf. Rule 52(b), Fed.R.Crim.P., which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
 
 
 39
 It seems to us that the district court's use of the wrong edition of the guidelines affected a substantial right and constituted plain error. The government makes no attempt to defend the fairness of using the wrong sentencing scheme, and it appears manifestly unfair to us. The error seriously compromised the integrity of the sentencing proceedings, in our judgment--and we believe that the public reputation of the proceedings can only be vindicated by resentencing Mr. Smith under the proper edition of the Guidelines Manual.
 
 
 40
 This conclusion is not inconsistent with our decision in United States v. Nagi, 947 F.2d 211 (6th Cir.1991) ("Nagi I"), cert. denied, 504 U.S. 958 (1992), on which the government relies. In the Nagi situation, as we had occasion to explain in Nagi II, there was a factual dispute as to when the defendant's criminal activity had ended. Nagi II, 90 F.3d at 134; id. at 136-37 (Nelson, J., concurring). The prosecutor took the position that the activity had continued until after the effective date of a new edition of the Guidelines Manual, and the defendant's counsel took the opposite position. In full awareness of what he was doing, one of the defendant's lawyers negotiated a plea bargain that called for sentencing under the later edition, but that led to a sentence "by no means unattractive, from the defense standpoint, under either version of the guidelines." Id. at 137 (Nelson, J., concurring). It was against this background that we held, in Nagi I, that the use of the later edition of the guidelines was not plain error, both sides having agreed to the application of the earlier edition. 947 F.2d at 213. And in Nagi II we went on to hold that the district court did not err in concluding that the performance of the defendant's counsel passed constitutional muster under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984).
 
 
 41
 These holdings have no bearing on the case now before us. Here, as we have seen, it was undisputed that the defendant's criminal activity ended well before the effective date of the new edition of the guidelines--and here there was no conscious waiver of the right to have the sentence determined under the earlier edition.
 
 
 42
 The convictions are AFFIRMED, the sentence for the offense charged in Count 2 of the indictment is VACATED, and the case is REMANDED for resentencing on that count.