**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Grady JOHNSON and Curtis L. Byrd,**
**Jr., Defendants–Appellants.**

Nos. 02–5984, 03–5251, 03–5252.

United States Court of Appeals,
Sixth Circuit.

July 8, 2004.

Tracy L. Berry, Asst. U.S. Attorney, Katrina U. Earley, Asst. U.S. Attorney, U.S. Attorney's Office, Memphis, TN, for Plaintiff–Appellee.

Bruce I. Griffey, Office of Bruce Irwin Griffey, Robert C. Brooks, Memphis, TN, for Defendants–Appellants.

Curtis L. Byrd, Jr., Memphis, TN, pro se.

Before SUHRHEINRICH and GIBBONS, Circuit Judges; and LAWSON, District Judge.*

GIBBONS, Circuit Judge.

Defendants-appellants Grady Johnson and Curtis L. Byrd, Jr. appeal their sentences of eighteen months imprisonment for mail fraud. Johnson and Byrd pled guilty to separate counts of an indictment charging them with violations of 18 U.S.C. §§ 1341 and 1342. The district court used the 1998 edition of the United States Sentencing Guidelines Manual to calculate Johnson's sentence and the 2002 edition to calculate Byrd's. On appeal. Johnson contests the district court's conclusion that he committed a portion of his offense while under a criminal justice sentence. He also argues that the court erred when it used the 1998 edition of the Guidelines Manual to calculate his sentence. Byrd challenges the district court's use of the 2002 edition of the Guidelines Manual, and he argues that the court failed to consider his ability to pay before assessing a $20,000 fine. For the following reasons, we affirm Johnson's sentence, vacate Byrd's sentence, and remand Byrd's case for resentencing under the 1998 edition of the Guidelines Manual.

### I.

On December 18, 2001, a federal grand jury in the Western District of Tennessee returned a nine-count indictment against Johnson, Byrd, Kimberly Hill–Johnson, and Kevin Hill, stemming from the submission of several fraudulent residential loan applications to the National Bank of Commerce ("NBC") and Southeastern Mortgage of Tennessee. Inc. ("Southeastern Mortgage"). These applications contained false supporting documentation and were submitted to both financial institutions by mail. The indictment charged that "[b]eginning on or about March 1,

---

* The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

2000 and continuing to on or about August 4, 2000." the defendants engaged in a "scheme and artifice to defraud and obtain property" by preparing fraudulent home loan applications and supporting documents. The indictment also alleged that part of the scheme was that NBC and its subsidiaries would rely upon the fraudulent documents in approving home loans.

## A. Grady Johnson

Pursuant to a plea agreement, Johnson pled guilty to Count 2 of the indictment on April 25, 2002. Count 2 charged that "on or about May 29, 2000," Johnson submitted a Uniform Residential Loan Application along with fraudulent supporting documents to NBC in the name of his brother, Milton Johnson. The application was for the purchase of a residence at 6164 Live Oak Cove in Memphis, Tennessee. It was submitted to NBC by mail and dated March 27, 2000. Several falsified documents accompanied the loan application, including a letter explaining Milton Johnson's lack of credit, a letter reflecting that Milton Johnson had made monthly payments on a $2,000 loan, and a credit reference letter from Memphis Light Gas and Water. According to the presentence investigation report ("PSI"), Johnson's wife, Kimberly Hill–Johnson, told the investigating officers that the loan application was submitted in Milton Johnson's name because Johnson could not qualify for the credit needed to purchase the house in his own name.

At sentencing, Johnson admitted to submitting a false credit report with the residential loan application and to signing the application using his brother's name and social security number. He also testified,

contrary to information contained in the PSI, that his brother was aware that he was the sole signatory on the loan. According to the PSI, Milton Johnson told investigators that he thought he was co-signing for the loan and that he did not know the house was solely in his name. In his interview, with investigators, Milton Johnson admitted to signing the closing documents, but denied signing the loan application. Johnson testified that his brother told him that he could use his name and social security number on the loan application and that both of them attended the closing.

Johnson attended the closing on April 18, 2000. four days after he had been placed on diversion by a state court for two separate controlled substance offenses. In calculating Johnson's criminal history category, the PSI recommended adding two points under United States Sentencing Guidelines Manual § 4A1.1 because Johnson had committed part of his offense while under a criminal justice sentence, giving Johnson a total of seven criminal history points and a criminal history category of IV. The probation officer used the 1998 edition of the Guidelines Manual to calculate Johnson's offense level "due to ex post facto concerns." Under § 2F1.1. Johnson's base offense level was six. His offense level was increased by four because the amount of the loss was more than $20,000 but less than $40.000,[1] and by an additional two levels for more than minimal planning under § 2F1.1(b)(2). Johnson also received a two-point reduction for acceptance of responsibility. With a total offense level of ten and a criminal history category of IV, Johnson's guideline

---

1. The original PSI stated that the amount charged off the loan was $31,907.56. This figure erroneously included unpaid interest and escrow subsidy. In response to an objec-

tion from Johnson, the amount of the loss was later amended to $20,736.34. Thus, even after the adjustment the loss remained more than $20,000 but less than $40,000.

range for imprisonment was 15 to 21 months.

Prior to sentencing, Johnson objected to the two-point increase in his criminal history score under § 4A1.1(d), arguing that the instant offense had been completed by the time he was placed on diversion. He also argued that his guideline range should have been calculated using the 2001 edition of the Guidelines Manual. Under the 2001 version, Johnson's sentence would have been calculated under § 2B1.1,[2] which does not provide for a two-point enhancement for more than minimal planning, as had been the case under § 2F1.1(b)(2). According to Johnson, if the 2001 edition of the Guidelines had been used, his base offense level would have been six and he would have received a four-point increase under § 2B1.1(b)(1)(C) because the amount of the loss exceeded $10,000. With a two-point reduction for acceptance of responsibility, Johnson argued that his total offense level using the 2001 Guidelines Manual would have been eight, a two-point decrease from his total offense level under the 1998 edition of the Guidelines Manual. In response, the government argued that Johnson's total offense level would have remained the same if the 2001 edition had been used because he would have received a two-point enhancement under § 2B1.1(b)(9)(C)(i) for identity theft for using a means of identification (his brother's name and social security number) without authorization to obtain another means of identification (the account number of the bank loan).

The district court rejected both of Johnson's arguments. The court found that Johnson's attendance at the closing on April 18, 2000 was a continuation of his fraudulent scheme and sustained the two-point enhancement under § 4A1.1. In reaching this conclusion, the court indicated that it was also influenced by the fact that Johnson had pled guilty to conduct occurring "on or about May 29, 2000" when he pled guilty to Count 2 of the indictment. With respect to Johnson's argument that his guideline range should have been calculated using the 2001 edition of the Guidelines Manual, the district court was persuaded by the government's argument that Johnson would have received the two-point enhancement under § 2B1.1(b)(9)(C)(i) and that his total offense level therefore would have been the same even if the 2001 edition had been used. The court then sentenced Johnson to 18 months imprisonment and three years of supervised release, and ordered restitution in the amount of $20,736.34 to NBC. On appeal, Johnson argues that the district court erred when it found that he had committed part of his offense while he was under a criminal justice sentence. He also objects to the district court's use of the 2001 edition of the Guidelines Manual in calculating his sentence.

## B. Curtis Byrd

On August 8, 2002, Byrd pled guilty to Count 3 of the indictment, which alleged that, "on or about June 27, 2000," he submitted a Uniform Residential Loan Application and fraudulent supporting documents from Nicole Felts to Southeastern Mortgage. The Felts loan application included a social security number that had been assigned to another individual, fraudulent credit references and W–2 forms, and a fraudulent verification of employment at Southeast Investment Corp. ("Southeast Investment") that listed the supervisor's name as Fred Daws, an alias

---

**2.** Section 2F1.1 was deleted by consolidation with § 2B1.1, effective November 1, 2001.

U.S.S.G. § 2F1.1, historical note (2001).

often used by Byrd. The total amount of the Felts loan was $90,400.

The PSI listed a second loan attributed to Byrd for $74.000 in the name of Shela Burnet. Byrd had been charged in Counts 1 and 6 of the indictment with submitting a Uniform Loan Application and other fraudulent supporting documents to NBC from Burnet. Count 6 charged that Byrd knowingly made a material false statement in a home mortgage loan application that Burnet had been employed by Southeast Investment for more than two years. According to the PSI, NBC suffered a loss of $20,667.69 as a result of the Burnet loan.

The PSI utilized the 2002 edition of the Guidelines Manual and recommended a base offense level of six under § 2B1.1, with an increase of four points for a loss of more than $10,000 but less than $30,000. This loss was listed as $20,667.69—the same amount as the loss suffered by NBC as a result of the Burnet loan. The PSI also recommended a two-point increase for identity theft under § 2B1.1(b)(9)(C)(i) and a two-point reduction for acceptance of responsibility. With a total offense level of 10 and a criminal history category of II, the PSI recommended a guideline range of imprisonment of 8–14 months.

At the sentencing hearing, the trial court considered Byrd's objection to the four-point increase for a loss of more than $10,000 but less than $30,000. Byrd argued that the loss from the Burnet loan could not be considered relevant conduct for purposes of sentencing because the government had not produced sufficient proof that he had written the false verification of employment for Burnet. In his written objection to the PSI, Byrd contended that, absent the four-point increase for the loss from the Burnet loan, his total offense level should have been six after adding a two-point enhancement for identity theft and subtracting two points for acceptance of responsibility. In support of his argument, Byrd introduced a report from Thomas Vastrick, a handwriting expert, concluding that Byrd had not written the request for verification of employment. The government responded by introducing the testimony of Agent Steve Orr of the United States Postal Inspection Service, who testified that he had interviewed Burnet after receiving a file prepared by NBC. This file included (1) W–2 statements indicating that Burnet had been employed at Southeast Investment, (2) a fraudulent credit reference from Memphis Light Gas and Water, and (3) a residential loan application. Orr stated that Burnet told him she had met with Byrd three times and that Byrd ultimately obtained the Burnet loan from NBC.

At this point, counsel for Byrd stated that, after speaking with the probation officer, he had concluded that even if Byrd prevailed on his argument against the four-point increase, his guideline range would remain the same because § 2B1.1(b)(9)(C)(i) provides for a minimum offense level of 12 if the offense involved identity theft. Thus, after a two-point reduction for acceptance of responsibility, Byrd's total offense level of 10 would have been the same total offense level recommended by the PSI. Although counsel for Byrd conceded that the four-point increase was no longer an issue, he also noted that the underlying issue of whether the Burnet loan could be considered relevant conduct was still important because it could impact the amount of any restitution ordered.

The district court concluded that the Burnet loan was not relevant conduct for purposes of sentencing and declined to add the proposed four-level enhancement for a loss of more than $10,000 but less than $30,000. The only evidence linking Byrd to the verification of employment was Bur-

net's statement to Agent Orr, and the court indicated that it was not comfortable relying on her hearsay statements to support the four-point increase. The court also noted that if the Burnet loan was not considered relevant conduct, there was no basis for ordering restitution.

Next, the court considered the government's objection to the proposed two-point reduction for acceptance of responsibility. On December 28, 2001, as a condition of his pretrial release, Byrd agreed to refrain from further employment in the home mortgage business. At sentencing, the government presented the testimony of Robert and Rita Suggs, who stated that Byrd had met with them in April and August of 2002 to help them obtain a loan for the purchase of a home. Robert Suggs testified that during a conversation in August 2002, Byrd advised him to tell anyone who called him that he was the part-owner of a daycare center despite the fact that Suggs had never been involved with a daycare center. After several delays with their loan. Byrd advised the Suggs to contact the finance company, and when they did so, a representative asked the Suggs if they were involved in the daycare business. In light of this testimony regarding Byrd's continued and possibly fraudulent involvement in the home mortgage business, the district court declined to grant a two-point reduction for acceptance of responsibility. With a total offense level of 12 and a criminal history category of II, Byrd's new guideline range for imprisonment was 12 to 18 months.

In light of Byrd's new offense level, the probation officer noted that the district court had discretion to impose a fine of $3,000 to $30,000 under § 5E1.2. In considering Byrd's ability to pay a fine or restitution, the presentence report noted that he had failed to submit a personal financial statement, although one had been requested. A consumer credit report reflected approximately $40,000 in liabilities. The PSI also noted that Byrd had a high school education and that he had made inconsistent statements regarding his current employment status. According to the PSI, Byrd told a probation officer that he had been unemployed since December 18, 2001, but his pretrial services officer reported that Byrd told him he had been self-employed until September 30, 2002.

At the sentencing hearing, the court did not inquire further into Byrd's financial status before sentencing him to 18 months imprisonment and assessing a $20,000 fine. Byrd did not object to any additional aspect of his sentence, nor did he object to the imposition of the fine. He contends for the first time on appeal that the 1998 edition of the Sentencing Guidelines Manual should have been used to calculate his sentence and that the district court should have considered his ability to pay before imposing the $20,000 fine.

## II.

In evaluating sentencing issues on appeal, this court reviews a district court's findings of fact for clear error and its legal conclusions *de novo*. *United States v. Edwards*, 272 F.3d 812, 815 (6th Cir.2001). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Jarman*, 144 F.3d 912, 914 (6th Cir.1998) (quoting *United States v. Perez*, 871 F.2d 45, 48 (6th Cir.1989)).

### A. Johnson's Four–Point Criminal History Enhancement

■ Johnson first contests the district court's decision to apply a four-point increase for committing the offense while under a criminal justice sentence. John-

son contends that he had already completed the offense of mail fraud by the time he was placed on diversion on April 12, 2000. He argues that appearing at the loan closing on April 18 and moving into the house in May should not count as relevant conduct because these events did not occur during the commission of his offense of mail fraud.

Under § 4A1.1(d), "[t]wo points are added if the defendant committed any part of the instant offense (i.e., any relevant conduct) while under any criminal justice sentence." U.S.S.G. § 4A1.1.(d) cmt. n. 4. Relevant conduct, for purposes of sentencing, includes "all acts ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Acts are part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, cmt. n. 9.

Johnson's contention that his offense of mail fraud was complete when the loan application was mailed on March 27, 2000 is contrary to applicable law and to what he specifically pled to in the indictment. The offense of mail fraud includes: (1) a scheme to defraud; and (2) use of the mails in furtherance of the scheme. *United States v. Smith*, 39 F.3d 119, 121 (6th Cir.1994) (citing *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). Count 2 of the indictment incorporated by reference earlier paragraphs alleging that Johnson was part of a "scheme and artifice to defraud and obtain property by means of false and fraudulent pretenses" and that, as part of this scheme and artifice to defraud and obtain property, NBC and its subsidiaries relied upon fraudulent documents in approving home loans. Part of Johnson's offense of mail fraud thus included a scheme to defraud NBC and its subsidiaries by submitting fraudulent documents that would be relied upon in approving home loans. Johnson's attendance at the loan closing was "part of the same course of conduct or common scheme or plan as the offense of conviction" and was properly considered relevant conduct for purposes of sentencing. He does not dispute that he had been placed on diversion four days earlier. The district court thus did not err when it concluded that Johnson had committed a portion of his offense while under a criminal justice sentence and that a two-point criminal history enhancement was therefore appropriate.

**B. Use of the 1998 Guidelines Manual to Calculate Johnson's Sentence**

■ Johnson next contends that his sentence should have been calculated using the 2001 edition of the Guidelines Manual. He argues that if he had been sentenced under U.S.S.G. § 2B1.1 (2001), his adjusted offense level score would have been two points lower than it was under § 2F1.1 (1998).

Generally, under 18 U.S.C. § 3553(a)(4), a sentencing court is to apply the version of the Guidelines in effect on the date of sentencing. *United States v. Kussmaul*, 987 F.2d 345, 350 (6th Cir.1993). However, the Ex Post Facto Clause of the Constitution "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Id.* at 351. When revision of the Guidelines "changes the legal consequences of the acts completed before its effective date" to a defendant's detriment, the Ex Post Facto Clause requires application of the Guidelines in effect at the time of the criminal act. *Id.* at 351–52 (quoting *Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987)).

In this case, the probation officer stated in Johnson's presentence report that the 1998 edition of the Guidelines Manual was used "due to ex post facto concerns." In an addendum to the report, the probation officer noted her disagreement with Johnson's contention that the 2001 edition would have been more favorable to him. The original report had recommended a total offense level of 10 under § 2B1.1 (1998), and the probation officer concluded that if the 2001 edition of the Guidelines Manual had been used, Johnson would have been subject to an adjustment under § 2B1.1(b)(9)(C)(i), which provides for a minimum offense level of 12 if the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." The government argued that Johnson used his brother's social security number without authorization to obtain a bank loan, and the commentary accompanying § 2B1.1 specifically identifies this situation as an example of conduct to which § 2B1.1(b)(9)(C)(i) applies:

A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.

§ 2B1.1 cmt. n. 7 (2001).

The district court did not err when it declined Johnson's request to be sentenced under the 2001 Guidelines. The court indicated that it was persuaded by the government's argument that the two-level enhancement for identity theft would have applied and adopted the PSI as its findings of fact, in spite of Johnson's testimony. It did not clearly err in doing so. According to the PSI. Milton Johnson told investiga-

tors he did not know the house was in his name and that he thought he was co-signing for the loan. From this information, the district court could find that, despite Johnson's testimony to the contrary, he had obtained his brother's social security number without authorization and used it to acquire an account number for a bank loan. Therefore, he would have been subject to a minimum offense level of 12 under § 2B1.1(b)(9)(C)(i), and, after a two-point reduction for acceptance of responsibility, his total offense level would have been 10, the same offense level recommended by the presentence report and adopted by the district court using the 1998 Guidelines. Any error resulting from the use of the 1998 edition as opposed to the 2001 edition was therefore harmless.

## C. Use of the 2002 Edition to Calculate Byrd's Sentence

Byrd argues that the district court violated the Ex Post Facto Clause by sentencing him under the 2002 edition of the Guidelines Manual because it resulted in the imposition of a harsher sentence than he would have received if he had been sentenced under the 1998 edition of the Guidelines Manual, which was the version in effect at the time of his offense conduct in Count 2 of the indictment. The PSI utilized the 2002 edition of the Guidelines Manual and recommended a total offense level of 12 because Byrd's offense involved identity theft. Byrd notes that the 1998 edition of the Guidelines did not contain an enhancement for identity theft. According to Byrd, if the district court had used the 1998 edition, his base offense level would have been 6 and he would have received a two-point increase for more than minimal planning under § 2F1.1(b)(2), resulting in a total offense level of 8. In response, the government argues that the 2001 edition of the Guidelines Manual applies because Byrd continued his criminal activity

through August, 2002, when he submitted fraudulent documents to a financial institution on behalf of Robert and Rita Suggs. The 2001 edition of the Guidelines also provides for an identity theft enhancement, meaning that Byrd's sentence would have been the same regardless of whether the 2001 or 2002 version was used.

Byrd did not object to the use of the 2002 edition of the Guidelines Manual before the district court. As such, this court reviews his claim of an alleged misapplication of the Guidelines for plain error. *United States v. Thomas*, 24 F.3d 829, 832 (6th Cir.1994). To establish plain error, the appellant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected an appellant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir.1998).

In this case, the use of the 2002 edition of the Guidelines was an obvious error that affected Byrd's substantial rights. *See United States v. Smith*, No. 95–5674, 1997 WL 168322, at *5–6 (6th Cir. Apr. 8, 1997). The government's contention that the 2001 edition should have been used to calculate Byrd's sentence is incorrect. Even if Byrd's involvement in the Suggs loan application can be considered relevant conduct for purposes of sentencing, § 1B1.11(b)(1) of the Guidelines provides that, "If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." Application Note 2 explains the meaning of the term "offense of conviction" as it relates to relevant conduct:

Under subsection (b)(1), the last date of the offense of conviction is the controlling date for ex post facto purposes. For example, if the offense of conviction (i.e., the conduct charged in the count of the indictment or information of which the defendant was convicted) was determined by the court to have been committed between October 15, 1991, and October 28, 1991, the date of October 28.1991 is the control date for *ex post facto* purposes. This is true *even if the defendant's conduct relevant to the determination of the guideline range under § 1B1.3 (Relevant Conduct) included an act that occurred on November 2, 1991 (after a revised Guideline Manual took effect).*

U.S.S.G. § 1B1.11 cmt. n. 2 (emphasis added). See also *United States v. Bennett*, 37 F.3d 687, 700 (1st Cir.1994) ("While the deceptive activities in April 1990 were unquestionably related to the charged fraud, and fit well into the definition of 'relevant conduct' set out in U.S.S.G. § 1B1.3, the date of relevant conduct is not controlling for ex post facto purposes."). The government does not contest that Byrd would have received a lower sentence had the 1998 edition of the Guidelines Manual been used. Use of the 2002 Guidelines Manual resulted in a sentence that was eight months longer than the maximum sentence Byrd would have received under the 1998 Guidelines. This was an error affecting Byrd's substantial rights that seriously compromised the integrity of the proceedings and it can only be rectified by resentencing him under the proper edition of the Guidelines Manual. *See Smith*, 1997 WL 168322, at *5. *See also United States v. Knight*, 266 F.3d 203, 207 (3d Cir.2001) (holding under plain error review that "an error in application of the Guidelines that results in use of a higher sentencing range should be presumed to affect the defendant's substantial rights").

Because we conclude that Byrd's case should be remanded for resentencing under the 1998 edition of the Guidelines Manual, we need not address his argument that the district court erred in imposing his fine. The court remains free to consider the possibility of imposing a fine under the 1998 edition of the Guidelines Manual at Byrd's resentencing.

## III.

For the foregoing reasons, we affirm Johnson's sentence, vacate Byrd's sentence, and remand his case for resentencing under the 1998 edition of the Guidelines Manual.